UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

STACEY HARRISON, et al.,

     Plaintiffs,

v.

AZTEC WELL SERVICING CO., INC.,
et al.,

     Defendants.

No. 1:20-CV-038-H

**MEMORANDUM OPINION AND ORDER ON
SUMMARY JUDGMENT**

This defamation case stems from debts owed to one of the defendants by someone other than the plaintiff. Having reviewed the five motions for summary judgment, responses and replies thereto, and appendices in support thereof, the Court concludes that genuine issues of material fact remain.

A jury must determine whether the advertisements at issue are false. A jury will also determine whether the Aztec Well Family is a joint enterprise. Should the jury conclude that it is, any alleged noncompliance with the Defamation Mitigation Act would be harmless, as a retraction demand was served on the individual who placed the offending advertisements.

The Court can resolve certain issues without a jury's help, though: Harrison's slander claim may not proceed due to a lack of evidence; no defendant may invoke the litigation privilege; the defendants may not argue that Harrison is libel proof; and Jason Sandel may not hide behind his corporate role to avoid liability.

Harrison's motion for summary judgment is denied. The defendants' motions are granted only as to the slander claim; they are denied in all other respects.

1.     **Factual and Procedural History[1]**

Stacey Harrison is an oilman.  He has numerous concerns spread across the state.

Harrison created a company—Harrison Lease Acquisition & Development Corporation—

through which he operated.  HLA&D is a subchapter S corporation with two employees,

Stacey and his wife, Wanda Harrison.  Dkt. No. 164 at 13, 51.  Stacey handles the

operational side of the business—providing consulting services to oil and gas projects,

sourcing opportunities and aggregating investors, and overseeing HLA&D's ownership

interests in various wells—while Wanda manages the back office.  Dkt. No. 164 at 49, 9.

The Harrisons own HLA&D outright.  *Id*. at 49.

The Aztec Well Family is a family enterprise.  Owned and operated by the Sandel

family, "the Aztec Well Family" is a moniker for a group of five companies—all of them

defendants—that operate in the oil and gas industry:  Aztec Well Servicing Co., Triple S

Trucking Inc., Double M Mud Co., Totah Rental & Equipment Co., and Roadrunner Fuels,

Inc.  Dkt. No. 117 at 76–77, 214, 405.  It also includes Aztec Drilling, a trade name for

Aztec Well Servicing's drilling operations, and Double M & Filter Service, the trade name

of Double M Mud, which no longer deals in mud.  *Id.* at 219–21.  Aztec Well Servicing

(AWS) is the 100% owner of the other four companies.  *Id.* at 213–14.  Jerry Sandel founded

AWS many years ago and still serves as President of all five companies.  *Id.* at 189, 192.  His

son, defendant Jason Sandel, serves as the Executive Vice President of all five companies.

Dkt. Nos. 164 at 381; 117 at 189, 192.  Michelle Sandel—Jerry's daughter and Jason's

---

[1] The Court primarily cites to Roadrunner's appendix (Dkt. No. 101), Harrison's appendix in support of his response to Roadrunner's motion (Dkt. No. 117), and Aztec's amended appendix (Dkt. No. 164).

sister—is the third and final officer, but she is not active in the businesses.  *Id*. at 189–190. Jerry and Jason run the businesses' day-to-day operations.  *Id*. at 190.

The companies share an operations office, addresses, phone numbers, payroll department, and accounting department.  *Id.* at 225.  The shared services are overseen by one business manager—Kimberly Luay.  *Id.* at 48–49.  The five companies all have separate bank accounts.  *Id.* at 227.  But the companies can seek loans from one another if necessary. *Id.* at 39–41, 114, 130.  They have done so in the past.  *Id.* at 41.  Jason draws a salary from AWS for his services.  *Id.* at 32.  He also draws a salary from Roadrunner Fuels for his services for Roadrunner, but that salary is not paid by Roadrunner; instead, AWS pays Jason and Roadrunner then reimburses AWS.  *Id.* at 68.  A similar model is used for the funding of the pooled services:  AWS pays for the shared services, then each subsidiary pays AWS for its share of the expenses.  *Id.*

All of the companies market themselves under the "Aztec Well Family" name.  *Id.* at 405.  Letterhead features "The Aztec Well Family" in large font above each of the companies' names.  Dkt. No. 101-1 at 33.  Brochures advertising the services of all of the companies introduce the companies as "The Aztec Well Family."  Dkt. No. 117 at 403–22. Employees—including Jason and Luay—use "The Aztec Well Family" on LinkedIn, which makes sense given that "The Aztec Well Family" has its own LinkedIn employer profile. *Id.* at 423–26.  Jason's business cards use "The Aztec Well Family."  *Id.* at 215.  His e-mail signature says "Jason Sandel[,] Executive Vice President/CVO[,] The Aztec Well Family." Dkt. No. 164 at 359.  And the contract that gave rise to this suit has "The Aztec Well Family" as its header.  Dkt. No. 101-1 at 54.  Despite all of this, Sandel insists that "The Aztec Well Family" "is not real."  Dkt. No. 117 at 51.

Regardless, AWS was contacted by representatives of Copper Ridge Resources. Dkt. No. 164 at 27. Copper Ridge was—it has since filed for Chapter 7 dissolution, *Id.* at 44—a company owned by Mark Burkett. *Id.* 49, 22, 28. Burkett is a petroleum engineer who worked as Copper Ridge's sole employee. *Id.* at 46, 51. Copper Ridge was what is known in the oil industry as an "operator." *Id.* at 17. Operators oversee the operations of an oil or gas well. *Id.* at 47. They are responsible for retaining, either directly or as a contractor, a "company man," who is the on-site supervisor or foreman. *Id.* at 27, 246. Operators are generally required to be licensed by the state and carry insurance. *Id.* at 47. And operators are ultimately accountable to the well's owners and vice versa: The owners of a well share pro rata in the well's expenses and revenues. *Id.* at 47–48. "Owners" may be a misnomer here because the "owners" may only have a leasehold interest in the right to drill for oil on land owned by another, but for simplicity's sake, "owner." *Id.* at 47. Each well is unique, as the liabilities of a well's owners for the operator's expenses can be fixed by contract. *Id.*

Copper Ridge was also what many might colloquially call an "operator": Burkett, through Copper Ridge and other entities owned or controlled by him, racked up millions of dollars in unpaid debt. *E.g.*, *id.* at 25–26. But this case is not about Mark Burkett.

Copper Ridge operated three wells in Gaines County, Texas—the Butler well, the Warren well, and the Maria 1X well. *Id.* at 17. All three wells were owned by various interests. *Id.* HLA&D owned an interest in two of the three—the Butler and Warren wells—though HLA&D's interest in the Warren well was minimal. *Id.* at 17. On all three, Copper Ridge hired HLA&D to provide independent consulting services—through Harrison—to supervise drilling operations, subcontractors, and equipment delivery. *Id.* at 16, 18–19, 26. HLA&D was paid weekly; Harrison received a 1099 rather than a W-2. *Id.*

at 49.  Harrison has never held a position in a company owned by Mark Burkett.  *Id.* at 18.

Burkett—with his engineering degree—handled the technical and geological aspects of the

project, *id.* at 49, while Harrison took responsibility for hiring subcontractors and general

operational management, *id.* at 26, 34.  Gary Brockman acted as the company man on those

sites—like Harrison, he was an independent contractor hired by Copper Ridge.  *Id.* at 26–

27.  In his capacity as a consultant, Harrison reached out to AWS to determine whether

Copper Ridge should retain AWS for services at the three well sites.  Dkt. No. 164 at 27.

Harrison spoke with Graham McMullen, AWS's drilling superintendent, *id.* at 267, over the

phone and in person to determine whether AWS and Copper Ridge would be a good match.

*Id.* at 27, 28.  Harrison testified that he, Brockman, and Burkett shared responsibility for

negotiating the contract that resulted.  *Id.* at 27.

   That contract was what is known as a "daywork" drilling contract—it specified a

daily rate for work performed rather than a "turnkey" contract, which specifies a fixed cost

for project completion, or a footage contract, which is self-explanatory.  *Id.* at 26.  Copper

Ridge retained AWS—and perhaps Triple S, though the record is unclear, *id.* at 29—to

provide services at the Warren, Butler, and Maria 1X wells.  *Id.* at 27.  That contract was

signed by Burkett on behalf of Copper Ridge and Sandel on behalf of AWS.  Dkt. No. 117

at 302.  As Sandel conceded, the contract did not name HLA&D or Harrison, and neither

AWS nor any of its affiliates or subsidiaries has ever had a contract with HLA&D.  *Id.* at

303.

   Because past is prologue, Copper Ridge failed to pay AWS for services rendered.  *Id.*

at 247.  The details of why are irrelevant; AWS claims it was owed $605,525 for the work it

performed on the Butler well—which for present purposes is the one that matters—but that

the total owing on the contract between Copper Ridge and AWS was $1.4 million. Dkt.
Nos. 117 at 358–59; 101-1 at 33. AWS, through Sandel and McMullen, negotiated with
Burkett, Harrison, and Brockman in an effort to reach a mutually agreeable payment plan.
Dkt. Nos. 157 at 30; 164 at 356–59; 168 at 310–311. When those efforts failed, AWS began
the process of foreclosing on the wells. *See* Dkt. No. 101-5 at 6–27 (Gaines County
petition). In essence, AWS had a mechanic's lien on the well by virtue of the operator's
unpaid debt. *Id*. at 13–16. To foreclose on their liens and liquidate the interest in
satisfaction of the debt, AWS had to provide notice to the well's owners. *Id*. The owners
could then elect to make AWS whole and seek recovery from the operator, thus removing
the threat of foreclosure. *Id*.

Sandel testified that he was advised by a Texas attorney, Randyl Meigs, that Texas
law required personal service on a well's interest owners in order to perfect a lien on the
well. Dkt. No. 117 at 282–83. Sandel testified that he personally did no investigation to
determine whether HLA&D actually owned an interest in the wells that AWS intended to
place liens on, but that a Landman was hired to investigate further. *Id.* at 253.

On October 1, 2019, Sandel sent a letter to Wanda Harrison, the registered agent for
HLA&D, at the address on file with the Texas Secretary of State's office. Dkt. No. 117 at
86–87, 284. That letter was seemingly drafted by Christopher Ochoa and Tyson Gobble.
*Id.* at 239–40, 245. Ochoa, despite his title as "Director of Legal Affairs," *id.* at 163, 204, is
not a lawyer, *id*. at 269–70. Gobble is an attorney in private practice whom AWS has
placed on retainer, *id*. at 239–42. The letter was printed on Aztec Well Family letterhead.
*Id.* at 212–13; Dkt. No. 137 at 491. Sandel conceded that the letterhead was that regularly
used in the course of business for AWS, and that it was AWS's "normal letterhead." Dkt.

No. 117 at 212.  The letter was sent in an envelope with a return address to the shared operations office's P.O. Box above a logo for "The Aztec Well Family."  Dkt. No. 137 at 501–02.

The goal of the letter was to inform HLA&D, which allegedly owned an interest in the Butler well, that Aztec had not been paid by Copper Ridge for services provided at the well.  Dkt. No. 117 at 239.  Accordingly, AWS would be perfecting a lien on the well where the services were provided.  *Id.* at 254.  The letter does not name or mention HLA&D or Harrison as owing any money to any Aztec entity.  Dkt. No. 137 at 491.  Attached to the letter as Exhibit A was a description of the property upon which AWS intended to place a lien.  *Id.* at 492–98.  Nowhere in Exhibit A is HLA&D mentioned.  *See id.*  Sandel admitted that he relied upon others in his capacity as EVP of AWS to determine whether or to what extent HLA&D owned a property interest in the property discussed in the October 1 letter. Dkt. No. 117 at 260.

The letter was sent by certified mail but returned as undeliverable.  *Id.* at 261–62. AWS then deployed one of its employees, a drilling superintendent named Misael Vital, to deliver the letter to the same address by hand.  *Id.* at 265–66.  In February 2020, after the commencement of this litigation and four months after the attempted service, Vital signed an affidavit of nonservice indicating that he attempted but was unable to serve HLA&D with the October 1 letter at its registered address.  *Id.* at 266–68.  Vital is not a process server.  *Id.* at 290.

Sandel admitted that he knew that Wanda Harrison was the registered agent for HLA&D.  *Id.* at 284.  He admitted that he did not know her relationship with Stacey.  *Id.* Sandel admitted that, prior to his October letter, he had communicated with Stacey

Harrison by phone and e-mail.  *Id.* at 284–85.  Sandel admitted that he never asked Harrison where he lived or conducted business and that he never investigated, or asked another to do so, where Harrison might be found.  *Id.* at 286.  He even admitted that he did not know what Harrison's position at or interest in HLA&D was.  *Id.* at 286–87.  No one associated with AWS attempted to locate any address other than the address listed on the Secretary of State's website.  *Id.* at 293–97.  Other than the attempt to mail and hand-deliver the letter, there were no other attempts to serve HLA&D with the notice of intent to foreclose.  *Id.* at 293.  Sandel admits that there has never been a formal contract between AWS and HLA&D.  *Id.* at 256–59.  Sandel confirmed that none of the unpaid services discussed in the letter were provided to HLA&D.  *Id.* at 248, 256.  Sandel admits that he was "not aware of any debt owing by Harrison Lease Acquisition & Development to Aztec Well Servicing." *Id.* at 258–59; *see id.* at 273.  Sandel admits that he undertook no personal investigation into Harrison.  *Id.* at 309.  Sandel further admitted that he made no investigation into HLA&D. *Id.* at 309–10.  And Sandel admitted that he made no investigation within the oil and gas industry into either Harrison or HLA&D.  *Id.* at 310.

AWS commenced litigation in Gaines County, Texas, on November 4, 2019, to foreclose on the Butler well.  Dkt. No. 186 at 415–38.

Allegedly unable to find Harrison and allegedly under the impression that Harrison needed to be personally served with notice of the already-filed foreclosure action, Sandel decided to place advertisements in the Abilene Reporter-News and the Midland Reporter-Telegram asking the public for help in finding Harrison and Burkett.  Dkt. No. 117 at 320–324.  The advertisements were targeted at "[a]nybody that would have information about how we could find either Mr. Burkett or Mr. Harrison" and ran in both papers on November 10, 2019.[2]  *Id.* at 311, 303.  The advertisements were identical in all material respects, and appeared as follows:



[2] There is ambiguity in the record as to whether the advertisement ran a second time, on November 13, in the Abilene Reporter-News.  *See* Dkt. No. 137 at 462–63.

– 9 –

Dkt. No. 164 at 184 (published in the Midland Reporter-Telegram).

Sandel drafted the language of the advertisements alone, except that his original draft of the advertisements omitted the word "INFORMATION" from the top.  Dkt. No. 117 at 303–04, 307.  Only after someone at one of the newspapers recommended to Ochoa that the ad be revised to include "INFORMATION" was it added to the proof provided to the papers.  *Id.* at 304.  Ochoa and Gobble saw drafts of the advertisement before it was placed.  *Id.* at 307.  Sandel chose the color red for the text as well as the red border.  *Id.* at 306.  Sandel lifted the photos of Burkett and Harrison off of their respective Facebook profiles.  *Id.* at 306.

The advertisements were not shared with Jerry Sandel until after it was placed, but Jerry knew that his son planned to run the advertisements.  *Id.* at 119, 199, 307.  Jason "felt that [he] had authority to act on behalf of the company" when placing the advertisements.  Dkt. No. 117 at 200.  Indeed, no one else at AWS had the authority to authorize the placement of the advertisements.  *Id.* at 280.  The board did not meet to discuss whether the advertisements should be placed.  *Id.* at 200.  Michele Sandel knew nothing of the ads' placement.  *Id.* at 200–01.  The advertisements were paid for by "The Aztec Well Family."  *Id.* at 401 (receipt from the Abilene Reporter News), 402 (same, for the Midland Reporter-Telegram).

On November 18, 2019, Harrison mailed a letter to Jason Sandel.  Dkt. No. 164 at 183.  The letter was addressed to Sandel at "Aztec Well Service[,] PO Box 100[,] Aztec, New Mexico" and had the subject line "Re: Request for Retraction[,] The Aztec Well Family.  *Id.*  The letter demanded that Sandel retract the advertisements and publish an apology in the same papers and in the same manner as the originals, which is to say under

the Aztec Well Family name.  *Id.*  That demand was timely under Texas's Defamation

Mitigation Act because it was made within one year of the advertisements' publication.

Tex. Civ. Prac. & Rem. Code § 73.055(b); *see id.* § 16.002(a) ("A person must bring a suit

for . . . libel [or] slander . . . not later than one year after the day the cause of action

accrues.").  Sandel refused.  Harrison then filed this lawsuit.  Dkt. No. 1; *see* Dkt. No. 77

(First Amended Complaint).

      The Court previously concluded that it has jurisdiction over Jason Sandel both

because his conduct intentionally extended into Texas and because he allegedly committed

a tort as a corporate agent of a company doing business in Texas.  Dkt. No. 62.  The Court

also denied the defendants leave to amend their answers because they came nowhere close

to demonstrating good cause for their tardy proposed amendments.  Dkt. No. 211.  Now,

both sides have moved for summary judgement on various issues.  *See* Briefs at Dkt. Nos.

100 (Roadrunner), 136 (Harrison), 156 (AWS & Triple S), 159 (Double M and Totah), 162

(Sandel); *see also* respective responses at Dkt. Nos. 116, 167, 185, 188, 182, and replies at

Dkt. Nos. 120, 175, 197, 198, 199.  Given the number of motions and grounds for summary

judgment presented, the Court will summarize each party's requests and positions in the

applicable analysis section.  In short, Harrison moves for summary judgment as to the

advertisements' falsity.  Roadrunner moves for summary judgment because it allegedly

played no role in publishing the statements.  So too for Double M and Totah.  Sandel moves

for summary judgment on the grounds that he cannot be liable both in his individual and his

corporate capacities.  And AWS and Triple S move for summary judgment on the grounds

that the advertisements were substantially true.  All of the defendants also argue that they

are protected by the absolute litigation privilege, that there was no negligence because they

were acting on the advice of counsel, and that Harrison is libel-proof.  The defendants also

seek summary judgment as to Harrison's slander claim.  The parties also made various

objections to evidence offered by the other side; those objections are addressed in

conjunction with the relevant substantive claim.

2.    **The Summary Judgment Standard**

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material fact and that the moving party is entitled to judgment as a matter

of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v.

Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

The substantive law determines which facts are material.  *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986).  Here, that law is Texas's.  *Troice v. Proskauer Rose, L.L.P.*, 816

F.3d 341, 345 (5th Cir. 2016); *see Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 228 (5th Cir.

2010) ("To determine issues of state law" federal courts "look to the final decisions of that

state's highest court.").  In the absence of a clear answer from the Texas Supreme Court, the

Court "must make an *Erie* guess and determine, in [its] best judgment, how that court would

resolve the issue if presented with the same case." *Chaney*, 595 F.3d at 228.

A dispute regarding a material fact is "genuine" if the evidence is such that a

reasonable jury could return a verdict in favor of the nonmoving party.  *Anderson*, 477 U.S.

at 248.  "Only disputes over facts that might affect the outcome of the suit under the

governing laws will properly preclude the entry of summary judgment."  *Id*.  Accordingly,

disputed fact issues that are "irrelevant and unnecessary" cannot preclude entry of summary

judgment.  *Id*.  When ruling on a motion for summary judgment, the Court is required to

view all facts and inferences in the light most favorable to the nonmoving party and resolve

all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

When a summary judgment movant will not have the burden of proof on a claim at trial, she can obtain summary judgment by pointing the Court to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex*, 477 U.S. at 324–25. Once she does so, the nonmovant must go beyond his pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The nonmovant's failure to produce proof as to any essential element renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F. Supp. 2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "The court has noted that the 'beyond peradventure' standard is 'heavy.'" *Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 923-24 (N.D. Tex. 2009) (Fitzwater, C.J.) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, No. 3:14-CV-1866-D, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.)).

Once the movant has made an initial showing that there is no evidence to support the nonmovant's case, the nonmovant must come forward with competent summary

– 13 –

judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.  *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Neither are unsubstantiated assertions, improbable inferences, and unsupported speculation.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).  And a party may not rely on inadmissible hearsay in opposing a motion for summary judgment.  *See Bellard v. Gautreaux*, 675 F.3d 454, 460–61(5th Cir. 2012).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.  *Ragas*, 136 F.3d at 458.  Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment.  *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992).  And while the Court must consider materials cited by the parties, it may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  "A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists."  *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (internal quotation marks omitted).  If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted.  *Celotex*, 477 U.S. at 322–23.  "When the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine dispute for trial." *Matsushita Elec. Indus.*, 475 U.S. at 586 (cleaned up).

Because both sides have filed motions for summary judgment, the Court will principally recount only the evidence that is undisputed.  If it is necessary to set out evidence that is contested, the Court will do so favorably to the party who is the summary judgment nonmovant in the context of that evidence.  *See GoForIt Ent., LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 718 n.4 (N.D. Tex. 2010) (Fitzwater, C.J.).

**3.     The Defamation Claims**

Harrison's complaint contains claims for slander and libel.  The defendants allegedly called others in the oil and gas industry and said disparaging things about Harrison's business practices.  The libel claim stems from the advertisements.

The defendants seek summary judgment on Harrison's slander claim.  Harrison seeks summary judgment as to the falsity of the advertisements, while the defendants seek summary judgment as to their truth.  Slander and libel are two sides of the same coin—they are both defamation.  After canvassing Texas's law of defamation, the Court addresses each claim in turn.

**A.     Governing Law**

Under Texas law, "[t]o recover for defamation, a private plaintiff must prove that the defendant (1) published a statement, (2) that was defamatory to the plaintiff, (3) while acting negligently as to the truth of the statement." *Montemayor v. Ortiz*, 208 S.W.3d 627, 651 (Tex. App.—Corpus Christi-Edinburg 2006, pet. filed) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)).  A statement is defamatory if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial

injury or to impeach any person's honesty, integrity, virtue, or reputation.  *See* Tex. Civ.

Prac. & Rem. Code § 73.001; *see also Einhorn v. La Chance*, 823 S.W.2d 405, 410–11 (Tex.

App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.).  "Defamatory statements are

'published' if they are communicated orally, in writing, or in print to some third person

capable of understanding their defamatory import and in such a way that the third person

did so understand." *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas

2003, no pet.) (citing *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex. App.—Dallas

1986, no writ)).  "The allegedly defamatory statement must be considered in context and in

light of the circumstances surrounding its publication." *Burch v. Coca-Cola Co.*, 119 F.3d 305,

326 (5th Cir. 1997) (quoting *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 743 (5th Cir.

1993) (internal citation and quotations omitted)).  Whether words may be defamatory is a

threshold question of law for the court. *Id.* at 325–26 (quoting *McKethan*, 996 F.2d at 743);

*Einhorn*, 823 S.W.2d at 411.

"Defamation" encapsulates two separate theories:  libel and slander.  An action for

libel requires the publication of a written defamatory statement about the plaintiff to a third

party. *M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 633–34 (Tex. App.—

Houston [14th Dist.] 1992, writ denied).  Slander is an oral defamation published to a third

party without legal excuse. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.

1995).

The degree and burden of proof applied in a defamation case hinges on the status of

the plaintiff as either a private individual or a public figure. *Einhorn,* 823 S.W.2d at 412.  A

private individual need only prove negligence,[3] whereas a public figure or official must prove actual malice. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). "'Actual malice' in this context does not mean bad motive or ill will." *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016) (quoting *Bentley v. Button*, 94 S.W.3d 561, 590–91 (Tex. 2002)). Instead, it means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *Huckabee v. Time Warner Ent. Co.,* 19 S.W.3d 413, 420 (Tex. 2000). To establish reckless disregard, the publisher must have "'entertained serious doubts as to the truth of his publication.'" *Huckabee*, 19 S.W.3d at 420 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)).

"The truth of the statement in the publication on which an action for libel is based is a defense to the action." Tex. Civ. Prac. & Rem. Code § 73.005(a); *Patton v. United Parcel Serv., Inc.*, 910 F. Supp. 1250, 1274 (S.D. Tex. 1995) (citing *Randall's Food Mkts.*, 891 S.W.2d at 646; *Farias v. Bexar Cnty. Bd. of Trs. for Mental Health Mental Retardation Servs.*, 925 F.2d 866, 878 (5th Cir. 1991)). To defeat defamation claim, a statement need not be perfectly true, as long as it is substantially true. *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019) (*Hall*); *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d. 781, 793 (Tex. 2019) ("To establish the truth defense at the summary judgment phase, a defendant must show that the gist of the publication is substantially true.") (citing *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990)). "This requires consideration of whether, in the mind of an average

---

[3] The Court notes that none of the defendants moved for summary judgment on the grounds that the statements were not negligently made. AWS and Triple S did raise the argument in responding to Harrison's motion for summary judgment. Dkt. No. 167 at 7. But, as Harrison notes, the defendants never pled reliance on the advice of counsel in their answers. *See* Dkt. No. 175 at 7. The Court has no occasion to pass on the question because the answer does not affect the outcome of the motions for summary judgment, but the Court notes the issue and any party is free to move in limine on the issues of negligence or reliance on the advice of counsel.

reader, the alleged defamatory publication is more damaging to the plaintiff's reputation than a true statement would be." *Scripps NP Operating*, 573 S.W.3d. at 793 (citing *Neely v. Wilson*, 418 S.W.3d 52, 63–64 (Tex. 2013), and *McIlvain*, 794 S.W.2d at 16); *see also D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 439 (Tex. 2017).  Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting of the defamatory charge is justified.  *Cox Media Gp., LLC v. Joselevitz*, 524 S.W.3d 850 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Put another way, "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).  And "[j]ust as the substantial truth doctrine precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details, [the law] permit[s] liability for the publication that gets the details right but fails to put them in the proper context and thereby gets the story's 'gist' wrong." *Id.*  So "a plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Id.*, *contra* Dkt. No. 167 at 5 & n.24. Indeed, the omission of critical facts that distorts the entire character of a communication not only can support a finding of falsity but can raise an inference that the publisher acted with intentional malice, too.  *Alaniz v. Hoyt*, 105 S.W.3d 330, 347 (Tex. App.—Corpus Christi-Edinburg 2003, no pet.), *abrogated on other grounds* by *Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879 (Tex. 2009); *but see* Dkt. No. 167 at 7 (AWS: "The Advertisements Were Not Made Negligently").

– 18 –

In short, when evaluating the motions for summary judgment, the Court adopts the view of the hypothetical reasonable reader and conducts "a single objective inquiry: whether the publication can be reasonably understood as stating the meaning the plaintiff proposes." *Dallas Morning News v. Tatum*, 554 S.W.3d 614, 631 (Tex. 2018) (cleaned up) (*Tatum*). The objectively reasonable reader does not place "overwhelming emphasis on a single term." *Rosenthal*, 529 S.W.3d at 437. Nor does he "focus on individual statements" to the exclusion of the entire publication. *Id.* He internalizes all of a publication's reasonable implications, and he considers inferential meaning carefully, but not exhaustively. In other words, "[h]e performs analysis, but not exegesis." *Tatum*, 554 S.W.3d at 631.

### B.      The Phone Calls

The defendants move for summary judgment as to Harrison's slander claim. Dkt. Nos. 100 at 5 (Roadrunner); 156 at 4–5 (AWS and Triple S); 159 at 4–5 (Double M and Totah); 162 at 4–5 (Jason Sandel). Harrison claims that Sandel and other Aztec employees made defamatory phone calls to others in the oil and gas industry. Dkt. No. 77 at 7–10 (First Amended Complaint); *see, e.g.*, Dkt. No. 8 (Harrison's response to AWS's motion for summary judgment as to the slander claim). The defendants all move to exclude two text messages Harrison offers as evidence of the phone calls. Those messages are hearsay, so the Court may not consider them. And because Harrison has not brought forth any other admissible evidence to support his slander claim, the defendants are entitled to summary judgment on it.

### i.      The Objections

In response to the defendants' motions for summary judgment on the slander claim, Harrison cited to (1) deposition testimony from Jay Norton that he received a call from a

debt collector working on Aztec's behalf and (2) a pair of text messages from other individuals in the oil and gas industry wherein the texters suggest that they, too, have been contacted by Aztec. *E.g.*, Dkt. No. 185 at 8 & nn. 30–33. The defendants, in their replies, object to Harrison's use of the text messages because they are hearsay—out of court statements offered for the truth of the matter asserted. *E.g.*, Dkt. No. 197 at 1–2[4]; Fed. R. Evid. 801(c). The Court may not consider inadmissible evidence, such as hearsay, when addressing a motion for summary judgment. *See Bellard v. Gautreaux*, 675 F.3d 454, 460–61 (5th Cir. 2012).

The messages are hearsay. They are out of court statements Harrison offers for the truth that Aztec made phone calls to the texters. No exemption or exception applies: the messages do not reflect a plan; there is no evidence to support a finding that they are a present sense impression or an excited utterance; nor can they be fairly considered as evidence of a modus operandi. Because they are inadmissible, the Court will not consider the text messages.

### ii.   The Remaining Evidence

Because Harrison bears the burden of proving that there was a statement made by an Aztec-affiliated individual, he must offer more than a mere scintilla of evidence to defeat the defendants' motions for summary judgment. *E.g.*, *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003). This he cannot do.

Having excluded the text messages, the lone evidence that Harrison cites to—or that the Court can find in the evidence before it—is the phone call that Jay Norton received from

---

[4] Throughout, the Court will cite to one of the defendants' filings that is representative. If there are arguments raised by one defendant but not others, the Court will note as much. But the Court assumes that the parties are familiar with their positions and arguments.

a debt collector working on Aztec's behalf.  *See* Dkt. No. 186 at 322–25.  But Harrison has not offered evidence as to Aztec's role in instigating that phone call, nor has he presented evidence as to the contents of that phone call.  Even if there were a statement published—that someone from Aztec called the debt collector—there is no admissible evidence as to the content of the phone calls.  Without evidence as to either publication or falsity, Harrison could not prevail at trial.

And even if the Court were to add the excluded texts to the mix, they would offer Harrison little help.  Neither message says, "Aztec called me":  the first says "He got it from Tim Torez at Aztec" without making clear who called whom; the second says "I've been informed by Aztec," again without making clear in which direction the outreach flowed. Dkt. No. 186 at 353–54.  Nor do the text messages provide any evidence beyond conjecture and inference as to the content of the communications.  Of course, it is entirely plausible that individuals called Aztec in response to the advertisements, at which point Aztec-affiliated individuals made statements.[5]  Indeed, such a theory is supported by the record. *E.g.*, Dkt. Nos. 164 at 307 (deposition of Alvin Jarrett); 168 at 312–14 (e-mails between

---

[5] Nothing in this opinion should be construed as permitting or precluding Harrison from recovering damages stemming from phone calls induced by the advertisements.  *See In re Lipsky*, 411 S.W.3d 530, 544 (Tex. App.—Fort Worth 2013, orig. proceeding) ("[A] defendant may be liable for defamation if a reasonable person would recognize that an act creates an unreasonable risk that defamatory matter will be communicated to a third party."), *mandamus denied*, 460 S.W.3d 579 (Tex. 2015); *see also Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 639 (Tex. App.—Houston [1st Dist.] 2002, no pet.) ("Although a party is generally not liable for a republication of a defamatory statement by another, '[i]f a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third party, the conduct becomes a negligent communication, which amounts to a publication just as effectively as an intentional communication.'" (quoting *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 396 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.)).  The parties are free to address that issue in due course.

– 21 –

Jarrett & Burkett).  But a reasonable jury could not, on the basis of the text messages and Norton's testimony, return a verdict for Harrison on his slander claim.

Accordingly, Harrison's slander claim fails, and the defendants' motions for summary judgment on that claim are granted.

### C.    The Advertisements[6]

Harrison seeks summary judgment as to the advertisements' falsity, Dkt. No. 136 at 7–10, while the defendants seek a judgment that they are true, *e.g.*, Dkt. No. 156 at 5.  Since there is ambiguity—however slight—as to whether the advertisements were false, neither side is entitled to summary judgment.

To prevail on summary judgment, Harrison must demonstrate beyond peradventure every element of his claim.  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  To defeat the defendants' motions, he need only raise a genuine dispute of material fact as to each element.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "In Texas, a defendant is liable for defamation if he negligently publishes a false statement that defames the plaintiff and causes damage."  *Mandawala v. Northeast Baptist Hospital*, 16 F.4th 1144 (5th Cir. 2021) (citing *Rosenthal*, 529 S.W.3d at 439 (Tex. 2017)).

The defendants concede both that the wanted posters were published and that they were factual, as opposed to matters of opinion.  Dkt. No. 167 at 4.  The parties do not clearly address whether Harrison is a public or a private figure.  *See* Dkt. Nos. 136 at 10–12 (Harrison arguing for a negligence standard); 167 at 7 (AWS seeming to accept that

---

[6] Harrison and Roadrunner make various objections to evidence offered by the other.  Dkt. Nos. 116 at 8–10 (Harrison's objections); 120 at 8–11 (Roadrunner's).  The Court sustains Roadrunner's and overrules Harrison's, but the Court did not rely on any of the objected-to evidence in reaching its conclusions so any error would be harmless.

negligence is the applicable standard).  Regardless, the public/private determination is one

for the Court.  *See Rosanova v. Playboy Enterps., Inc.*, 580 F.2d 859, 862 (5th Cir. 1979)

("[W]here undisputed facts admit to but one conclusion, then, on motion for summary

judgment, the court properly decides the issue.").  The evidence here conclusively

establishes that Harrison is a private figure.  He is not a celebrity, nor was the dispute

between AWS and Copper Ridge "public both in the sense that people are discussing it and

that people other than the immediate participants in the controversy are likely to feel the

impact of its resolution."  50 Tex. Jur. 3d Libel & Slander § 15 (2015 ed.) (citing *WFAA-TV*,

978 S.W.2d 568).  Accordingly, at trial Harrison need only demonstrate negligence on the

defendants' part.

 The crux of the dispute over the advertisements is whether they are true or false.

### i.  True or False

 The defendants argue that the advertisements are true, so they are entitled to

summary judgment on Harrison's libel claim.[7]  Meanwhile, Harrison argues the opposite—

that the advertisements are false—and so he is entitled to summary judgment in his favor.

But the advertisements are ambiguous, so a jury will have to decide whether they are true or

false.

 Because he bears the burden of proof at trial, for Harrison to prevail on his motion

for summary judgment as to the advertisements' falsity, he must establish beyond

peradventure that the statements were false.  On the other hand, to survive the defendants'

motion for summary judgment as to the advertisements' falsity, he need only demonstrate

---

[7] Various defendants also argue that they had no role in publishing the advertisements.  That
argument is taken up below.  *See infra* at 4.D.ii.

that a reasonable jury could return a verdict in his favor—in other words, agree that the statements were false. "In trying a libel action, the initial question for determination is a question of law to be decided by the trial court: were the words used reasonably capable of a defamatory meaning." *Musser v. Smith Protective Servs.*, 723 S.W.2d 653, 654 (Tex. 1987). Having reviewed the parties' submissions and evidence, the Court concludes that whether the advertisements are true or false is ambiguous. Since a reasonable jury could return a verdict for either party on the issue, neither side is entitled to summary judgment on falsity.

The first statement—that "we have attempted to legally serve these two men"—is factually false. The uncontroverted deposition testimony offered by Sandel is that there were attempts to serve HLA&D by both certified mail and personal service. But none of the defendants offers admissible evidence that AWS or any other defendant attempted to serve notice of the Gaines County lien on Harrison himself. Moreover, Harrison and HLA&D are not the same thing. Who was amenable to service under Texas law is irrelevant. *See* Dkt. No. 57 at 11–12 (explaining the issue in greater detail). What matters is whether the statement that Aztec attempted to serve Harrison is true; it is not. As Sandel testified, there were no attempts to contact Harrison outside of the letter and Vital's visit to HLA&D's registered address between the date of the letter and the placement of the advertisements. This is so despite Sandel having access to Harrison's phone number and e-mail address. Dkt. No. 117 at 284–85, 377–88.

The second statement—"in an effort to collect millions in outstanding debt"—is literally untrue, though perhaps in a trifling sense. In common parlance, few would describe $1.4 million as "millions." Indeed, a deponent—and even the defendants' own counsel— used the phrase "over a million dollars" to describe the amount Copper Ridge owed to

AWS.  Dkt. No. 164 at 312 (Alvin Jarrett); 30 (Aztec's counsel).  Sandel attempted to

explain his use of the plural by saying "if it was 14,000, I would say 'thousands.'"  *Id.* at

139.  Fourteen is greater than two, so that attempted clarification falls flat.

The truth of the third and final statement—"they are nowhere to be found"—is less

susceptible to textual parsing.  Of course, in a literal sense, the wanted ads are redundant if

Harrison were truly nowhere to be found; all the help in the world will not uncover

someone who literally cannot be found.  But, as the Texas Supreme Court has counseled,

Courts and juries should perform "analysis, not exegesis."  *Tatum*, 554 S.W.3d at 631.

Regardless of whether each of the three statements is true or false, as explained

above, Texas law is clear that a series of statements that is completely accurate can still—

through omission or misleading juxtaposition—give rise to an impression that is false and

therefore defamatory.  *Hall*, 579 S.W.3d at 380 (quoting *Turner*, 38 S.W.3d at 115).

Likewise, a series of technically incorrect statements can still be substantially true, thus

defeating a defamation action.  *Id.* at 393–394.  The whole is, in other words, more

important than the sum of its parts.  *See Turner*, 38 S.W.3d at 114 (holding publication

containing allegedly libelous statement "should be construed as a whole in light of the

surrounding circumstances based upon how a person of ordinary intelligence would

perceive it"); *Neely*, 331 S.W.3d at 914 (stating that "we do not engage in a technical

analysis of each statement in isolation, but consider the publication as a whole, viewed not

so much by its effect when subjected to the critical analysis of a mind trained in the law, but

by the natural probable effect on the mind of the average [viewer]" (internal quotation

marks and citations omitted)).

The advertisements are plainly susceptible of a defamatory meaning.  At his deposition, Jay Norton, a drilling contractor and the owner of Norton Energy Drilling, was asked, "Does reading that ad lead you to believe that Mark Burkett and Stacey Harrison personally owe the Aztec Well Family millions of dollar[s]."  Dkt. No. 164 at 348–49.  "I would assume so," he answered.  *Id.* at 349.  Later, when asked "Do you think this ad could hurt Stacey Harrison's business reputation?" he responded, "It probably could, yes."  *Id.* at 349.  Josh Stewart testified similarly:  "Q:  But could an ad like this damage someone's reputation? . . . A:  I guess people with [no] knowledge of the situation, it could sway opinions."  *Id.* at 290.  As Sandel admits, Harrison owed Aztec no money.  Dkt. No. 117 at 258–59.  Harrison has therefore offered ample admissible evidence that could lead a reasonable viewer to conclude that the advertisements were false.  Accordingly, the defendants are not entitled to summary judgment as to falsity.  Given that the three statements are not obviously false, however, Harrison has not demonstrated beyond peradventure that the advertisements' gist is false.

The Court notes that at Harrison's deposition, counsel for Aztec spent an extended period presenting Harrison with examples of liens filed against entities affiliated with Mark Burkett.  Dkt. No. 164 at 23–26.  None of the liens were filed against Harrison or HLA&D or alleged nonpayment by either.  The juxtaposition of Harrison with Burkett—who was, on the basis of the exhibits Aztec offered at that deposition, in some way involved in myriad disputes over nonpayment—in one advertisement demonstrates how misleading the advertisement was.  *See* Dkt. No. 164 at 260 (Josh Stewart testifying that Mr. Burkett is "worse than Mr. Harrison.").  In lumping Harrison in with Burkett, Harrison was tagged with all of the debts Burkett and his affiliated entities had accumulated.  But none of those

debts—as Aztec conceded at Harrison's deposition and in its filings—are attributable to Harrison in his personal capacity or as the owner of HLA&D.  This strongly supports an omissions theory of falsity.  Recall that "[t]he test used in deciding whether [a statement] is substantially true involves consideration of whether the alleged defamatory statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have been."  *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) (citations omitted).  So while a reasonable jury might conclude that the statements are substantially true, most reasonable juries would conclude that much more information would need to be added to the advertisements to remove their sting.

The Court will not, however, preclude a jury from being the final arbiter of the statement's truth or falsity.  The meaning of the advertisements—their gist—is ambiguous.  And given that each side has raised evidence as to the advertisements' veracity sufficient to defeat the other's motion for summary judgment, a jury will determine whether the "gist" of the advertisements is true or false.

### ii.   Damages

There are two types of defamatory statements:  defamation per quod, which requires proof of special damages to be actionable, and defamation per se.  *Alaniz*, 105 S.W.3d at 345 (citing *Padilla v. Carrier Air Conditioning*, 67 F. Supp. 2d 650, 663 (E.D. Tex. 1999)).  "Words may be defamatory per se if they are so obviously harmful to the person aggrieved that no proof of their injurious effect is necessary to make them actionable."  *Id.* (internal citation omitted).  The law characterizes words as defamatory per se if they: (1) impute a crime, (2) impute a loathsome disease, (3) tend to injure a person's office, business, profession, or calling, or (4) impute sexual misconduct.  *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1161

(5th Cir. 2006) (quoting *Gray v. HEB Food Store N. 4*, 941 S.W.2d 327, 329 (Tex. App.—

Corpus Christi 1997, writ denied)).  If words are defamatory per se, a plaintiff is not

required to plead or prove special damages; rather, the law presumes actual damage.

*Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 310 (5th Cir. 1997); *see also Belli v. Orlando

Daily Newspapers, Inc.*, 389 F.2d 579, 582 (5th Cir. 1967) (finding words defamatory per se if

they tend to injure one's business or profession or if the natural and proximate cause of such

a statement is such injury, without requiring proof of actual injury).

A detour to explain the difference between falsity and ambiguity is warranted by the

defendants' briefing.  Saying, for example, "Daniel eats pork" is defamatory per quod

because to understand why the statement hurts Daniel, one has to know that Daniel, in this

example, keeps kosher.  If the publisher establishes that Daniel takes medication derived

from pigs, the publisher might be able to prove that the statement is substantially true and

thus avoid all liability.  At the same time, Daniel might be able to convince a jury that the

gist of the statement is false if the average reader would conclude that Daniel eats BLTs.

But even if Daniel succeeds in convincing the jury that the gist of the statement is false, he

will not be permitted to recover general damages because understanding the harm caused by

the statement requires extrinsic evidence—the knowledge that Daniel keeps kosher.

Defamation per se, on the other hand, requires no extrinsic evidence as to the

harmful meaning of the words.  Statements about a person's fitness for business, venereal

disease, or criminality are of the sort that everyone understands as damaging to one's

reputation, so general damages—those that compensate solely for the value of one's good

name—are available when a statement's meaning falls into one of those categories.  Those

damages are not available, however, when extrinsic evidence—that Daniel keeps kosher—is

necessary to give the statements a harmful meaning because the general public is not expected or presumed to know that Daniel keeps kosher.  To be sure, other damages are available in a case of defamation per quod like Daniel's, but he must plead and prove some harm to his reputation to prevail—the law will not presume one.

In short, a statement's meaning—the information it conveys to the audience—is determined independently from its veracity.  Harrison appreciates the distinction, *see e.g.*, Dkt. No. 136 at 8–10, but the defendants do not, *see e.g.*, Dkt. No. 167 at 6–7 (discussing defamation per quod and "objectively true statements" in the same analysis).  That is why the defendants miss the mark when they argue that Harrison must prove damages, or that his is a case of defamation per quod.  Context—that Harrison owed no debt—may be needed to understand why the statements are false, as the defendants assert, but no reference to outside sources or, as the defendants put it, "innuendo" is needed to understand why the statements are harmful.  In the defendants' world, a case of defamation per se would go to a jury only as to damages—never as to falsity or publication.  That is plainly not the case.  But the defendants are not to be faulted for their misunderstanding:  the law of defamation—per se and per quod, textual and extrinsic, explicit and implicit—is a morass that has ensnared many an able counselor and jurist.  *See Tatum*, 554 S.W.3d at 627 ("parties and courts have often confused the two"), 645 (Justice Boyd's concurrence noting that "we should always do our best to reduce the confusion, or, at least avoid adding to it.").

Here, the advertisements, if they are substantially false, do nothing but harm Harrison in his professional capacity.  They impugn his business acumen and creditworthiness and are signed by a business organization in his own industry.  Others in the oil and gas business expressed that they would not want such advertisements printed

about them:  Alvin Jarrett said "That poster would have an impact on anyone. . . yeah you don't want that out there."  Dkt. No. 160 at 319.  Because the advertisements are capable of defamatory meaning and because they go directly to Harrison's occupation and business, he need not plead or prove damages:  the words, if false, are defamatory per se.  *Alaniz*, 105 S.W.3d at 345.  Defamation per quod is therefore entirely inapposite in this case, *contra* the defendants.  Either the statements are false and therefore defamatory per se, or they are true and unactionable.

## 4.   Defenses

The defendants seek summary judgment as to various defenses.  None succeed.

### A.   The Judicial-Proceedings Privilege

The defendants argue that they are entitled to summary judgment under the judicial-proceedings privilege—a form of absolute immunity.  Because they bear the burden of proving that the privilege applies, the defendants must establish their entitlement to its protections beyond peradventure.

The judicial-proceedings privilege is of near-ancient origin.  In 1591, the King's Bench held that a plaintiff—accused by the defendant of being "a maintainer of pirates and murderers"—could not pursue a defamation action because the defendant's statements were made in "[the] course of justice."  *Buckley v. Wood,* (1591) 76 Eng. Rep. 888, 889 (K.B.).  American law has never strayed from that rule.

Thus, in Texas, "[c]ommunications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made."  *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982) (citing *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909 (Tex. 1942)).  This absolute privilege

applies to "testimonial statements made in the course of judicial proceedings (and particular statements preliminary to such proceedings) and to testimonial statements made in the course of 'quasi-judicial' proceedings." *Cuba v. Pylant*, 814 F.3d 701, 715 (5th Cir. 2016) (citing *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015)).  The privilege extends to statements made by judges, jurors, counsel, parties, or witnesses and to statements in contemplation of and preliminary to judicial proceedings. *Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 27–28 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

The question whether an alleged defamatory communication is related to a proposed or existing judicial or quasi-judicial proceeding, and is therefore absolutely privileged, is one of law to be determined by the court. *Perdue, Brackett, Flores, Utt & Burns v. Linebarger, Goggan, Blair, Sampson & Meeks, L.L.P.*, 291 S.W.3d 448, 453 (Tex. App.—Fort Worth 2009, no pet.); *Russell v. Clark*, 620 S.W.2d 865, 870 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.).  When deciding the issue, the court must consider the entire communication in its context and extend the privilege to any statement that bears some relationship to an existing or proposed judicial proceeding. *Watson v. Kaminski*, 51 S.W.3d 825, 827 (Tex. App.—Houston [1st Dist.] 2001, no pet.); *Russell*, 620 S.W.2d at 870.  All doubt should be resolved in favor of the communication's relevance to the proceeding. *See Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 239 (Tex. App.—Dallas 2000, pet. denied) (citing *Russell*, 620 S.W.2d at 870).

Texas, like nearly every other state, relies on the formulation of the privilege found in the Restatement (Second) of Torts. *See Shell Oil Co.*, 464 S.W.3d at 658; *Russell*, 620 S.W.2d at 868; *cf.* Restatement (Second) of Torts §§ 586–588.  That formulation provides that the statements must bear some relation to an existing or proposed judicial proceeding that is

contemplated in good faith and under serious consideration.  *BancPass, Inc. v. Highway Toll Admin., L.L.C.*, 863 F.3d 391, 402 (5th Cir. 2017); *see also Landry's Inc. v. Animal Legal Defense Fund*, 566 S.W.3d 41, 58 (Tex. App.—Houston [1st Dist.] 2018, pet. denied.) (rev'd in part on other grounds, *see* 631 S.W.3d 40) (noting that, in order for the immunity to apply, a party must show that, objectively, the proceeding relates to the litigation and, subjectively, the proceeding was considered in good faith).  "The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered."  Restatement (Second) of Torts § 586 cmt. e. Indeed, Texas courts have limited the privilege, cautioning that "[t]he privilege . . . cannot be enlarged into a license to go about in the community and make false and slanderous charges against [its] court adversary and escape liability for damages . . . on the ground that [it] had made similar charges in [its] court pleadings."  *De Manokowski v. Ship Channel Dev. Co.*, 300 S.W. 118, 122 (Tex. Civ. App.—Galveston 1927, no writ).[8]

Accordingly, "Texas caselaw suggests that the circumstances of the third-party recipient—and that party's relationship to the contemplated litigation—is relevant" to the Court's analysis of whether communications are related to a judicial proceeding.  *BancPass*, 863 F.3d at 404–05.  "Even statements aimed at parties not involved in the [contemplated judicial] proceeding are absolutely privileged if they bear some relation to a judicial

---

[8] A leading treatise on defamation reaches similar conclusions.  As Judge Sack writes, parties to litigation have an "absolute privilege . . . for defamatory statements made prior to, in the institution of, or during the course of, a proceeding."  Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 8.2.1.4 at 8–14 (3d ed. 2004).  And while this privilege covers communications adjunct or preparatory to legal proceedings such as communications to an attorney, "during the course of the proceeding" does *not* mean, *contra* the defendants, that the privilege extends to any statement made in any forum while a proceeding is pending that relates to the same subject matter as the proceeding.  *Id.*  Another leading commentator writes that "[t]he privilege is usually understood as not applying . . . to out-of-court statements made to persons not related to the litigation."  Rodney Smolla, Law of Defamation, § 8:9 at 8–12.4 (2d ed. 2005).

proceeding." *Id.* at 404–05 (citing *Thomas*, 940 S.W.2d at 344) (alteration in original).  But

in most jurisdictions, "for a communication to have some relation to a proposed or pending

judicial proceeding, 'the recipient of the communications must have a direct interest in the

litigation or possess evidentiary information relevant to it.'" *Id.*  (quoting Douglas R.

Richmond, *The Lawyer's Litigation Privilege*, 31 Am. J. Trial Advoc. 281, 320 (2007)); *see, e.g.*,

*Russell*, 620 S.W.2d at 870 (highlighting that the third-party recipients of an attorney's

allegedly-defamatory letter were potential witnesses who might have evidence to further the

attorney's claim).  State supreme courts[9] and other Circuits[10]  speak with one voice in

reaching the same conclusion.

    The Court also draws guidance from *Burzynski v. Aetna Life Insurance Co.*, 967 F.2d

1063 (5th Cir. 1992).  The communications in *Burzynski* were sent by the defendant to third-

party companies, attempting to dissuade them from doing business with Burzynski.  *See id.*

at 1065–67.  Although the letter in *Burzynski* described the specific litigation between the

---

[9] *E.g.*, *O'Barr v. Feist*, 296 So.2d 152, 157 (Ala. 1974) (quoting *Moore v. Mfrs.' Nat'l Bank*, 25 N.E. 1048, 1049 (N.Y. 1890)); *Collins v. Red Roof Inns, Inc.*, 566 S.E.2d 595, 602–603 (W.Va. 2002); *Fink v. Oshins*, 49 P.3d 640, 645–46 (Nev. 2002) ("[S]tatements to someone who is not directly involved with the actual or anticipated judicial proceeding will be covered by the absolute privilege only if the recipient of the communication is 'significantly interested' in the proceeding."); *Vahlsing Christina Corp. v. Stanley*, 487 A.2d 264, 267 (Me. 1985) (holding that the privilege may be "lost by unnecessary or unreasonable publication beyond the scope of the privileged circumstances.").

[10] *See Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 698 (8th Cir. 1979) ("[The absolute privilege] cannot be a predicate for dissemination of the defamatory matter to the public or third parties not connected to the judicial proceeding."); *Sriberg v. Raymond*, 544 F.2d 15, 15–17 (1st Cir. 1976) (noting that a third party to the litigation at issue, an escrow agent, "may have been no more than a neutral stakeholder, . . . [but] [t]he letter here suggests that the escrow agent, if not in complicity with the plaintiff, had at least been 'manipulated,' as part of a scheme by the plaintiff"); *Theiss v. Scherer*, 396 F.2d 646, 648 (6th Cir. 1968) (noting that the letter at issue, which the court found covered by the privilege, "was addressed to an attorney who represented a party with a financial interest in the proceedings" and that "[c]opies of the letter were sent only to those who had a direct financial interest in the settlement of the estate"); *Brown v. Collins*, 402 F.2d 209, 212–13 (D.C. Cir. 1968) ("Although the Restatement standard of 'relation' to the proceedings is broad, and does not require legal relevance, even that liberal standard is not met merely by showing that the defamatory comments were triggered by some pending lawsuit or the facts involved therein.").

parties and was styled as an "informal discovery request," the communications were
predominately composed of pejorative statements and warnings about fraudulent claims
allegedly made by the plaintiff.  *Id*. at 1065–66.  The Fifth Circuit concluded that the
communications were not protected under Texas law.  *Id*. at 1069.  In doing so, the Fifth
Circuit highlighted that the letters were sent to parties who could not "be reasonably
believed to have cognizable legal interest in the litigation" and noted that the recipient
companies' relationship to the litigation was "hypothetical at best."  *Id*. at 1068–69.

     In doing so, the *Burzynski* court cited approvingly *Bridge C.A.T. Scan Associates v. Ohio-
Nuclear, Inc.*, from the Southern District of New York.  608 F. Supp. 1187 (1985).  That
court applied New York law, which also applies the Restatement's theory of the privilege.
*Id.* at 1192; *see Park Knoll Assoc. v. Schmidt*, 451 N.E.2d 182, 184 (N.Y. 1983); *Brown v.
Maxwell*, 929 F.3d 41, 52 & n. 46 (2d Cir. 2019); *see also Long v. Marubeni Am. Corp.*, 406 F.
Supp. 2d 285, 292–296 (S.D.N.Y. 2005) (Lynch. J.).  The *Bridge* court concluded that the
nature of the communication did not justify a privilege because it was a preliminary inquiry
sent to persons "not yet known to possess information germane to litigation."  608 F. Supp.
at 1198 (quoting *Schulman v. Anderson Russell Kill & Olick,* 458 N.Y.S.2d 448, 453 (N.Y. Sup.
Ct. 1982)).  "The chilling effect of imposing liability for such statements," Judge Weinfeld
continued, "does not clearly outweigh an individual's interest in protecting his reputation or
a corporation's interest in protecting the reputation of its product."  *Id.*

     And just this May the Texas Supreme Court provided clarity on how Texas law
construes the privilege.  In *Landry's, Inc. v. Animal Legal Defense Fund*, a publisher
disseminated press releases containing intent-to-sue letters and then sought to invoke the
judicial-proceedings privilege to defend against the plaintiff's defamation suit.  631 S.W.3d

40, 44–45 (Tex. 2021).  In reversing the Court of Appeals' dismissal on privilege grounds,

the Supreme Court cited *Ross v. Heard* for the proposition that "a defendant could not claim

the privilege to avoid liability for sending out defamatory material to parties having no

cognizable legal interest in pending litigation."  *Id.* at 51 (quoting No. 04-04-00110-CV, 2005

WL 357032, at *3 (Tex. App.—San Antonio Feb. 16, 2005, no pet.)).  Moreover, the Court

clarified that the privilege does not "cover other publicity statements made apart from the

letter, such as statements to the press, blog posts, or social media activity."  *Id*. at 51.  Again,

other courts[11] and leading commentators[12] agree.

    All of this leads the Court to conclude that the defendants may not invoke the

privilege.  Here, the defendants claim the privilege to, as the Texas Supreme Court put it in

*Landry's*, "avoid liability for sending out [allegedly] defamatory material to parties having

no cognizable legal interest in [the] pending litigation."  631 S.W.3d at 51.  The average

reader of the Abilene or Midland papers would have zero interest in either the debt that was

owing to AWS or the lien foreclosure action—there is no fit whatsoever between the

---

[11] *See, e.g., Asay,* 594 F.2d at 697 ("Publication to the news media is not ordinarily sufficiently related to a judicial proceeding to constitute a privileged occasion."); *Bochetto v. Green*, 860 A.2d 67, 72–73 (Penn. 2004); *Green Acres Trust v. London,* 688 P.2d 617, 622 (Ariz. 1984); *Rothman v. Jackson,* 49 Cal. App. 4th 1134, 1148–49 (1996) (stating that the absolute privilege generally should not be extended to "litigating in the press"); *see also Milford Power Ltd. P'ship v. New England Power Co.,* 918 F. Supp. 471, 486 (D. Mass. 1996); *Seidl v. Greentree Mortg. Co.,* 30 F. Supp. 2d 1292, 1313–14 (D. Colo. 1998); *Kelley v. Bonney,* 606 A.2d 693, 707 (Conn. 1992); *Kennedy v. Zimmermann,* 601 N.W.2d 61, 64–65 (Iowa 1999); *Kennedy v. Cannon,* 182 A.2d 54, 58 (Md. 1962); *Kirschstein v. Haynes,* 788 P.2d 941, 951 n.27 (Okla. 1990) ("[U]nnecessary publication to the news media may result in loss of the privilege."); *Pratt v. Nelson,* 164 P.3d 366, 377–82 (Utah 2007) ("[W]e are disinclined to extend this broad [privilege] to statements made directly to the press, especially in a case such as this where a party called a press conference and distributed various statements to the media for widespread dissemination.").  Indeed, "'[c]ommunications made to newspapers and during press conferences have been almost universally found to be excluded from the protection of absolute privilege.'" *Med. Informatics Eng'g, Inc. v. Orthopaedics Ne., P.C.,* 458 F.Supp.2d 716, 724 (N. D. Ind. 2006) (quoting *Williams v. Kenney,* 877 A.2d 277, 288 (N.J. Super. Ct. App. Div.2005)).

[12] Sack on Defamation, § 8.2.1 at 8–19 ("[S]tatements made by parties to litigation to the public, during the course of press conferences, for example, . . . are not privileged.").

advertisements' recipients and the foreclosure proceedings Aztec was pursuing.  The

average viewer of the advertisements likely had no clue who Burkett and Harrison were or

the nuances of Texas law regarding service of working-interest owners with notice of a

subcontractor's intent to foreclose.  The ability of the average reader of the advertisement to

provide valuable information about Harrison's whereabouts to AWS in aid of its foreclosure

proceedings *after those proceedings had already commenced* is, at best, hypothetical.  Moreover,

the rights Aztec sought to secure in the Gaines County action were against HLA&D—not

Harrison.  *See Leaf Trading Cards, LLC v. The Upper Deck Co.*, No. 3:17-CV-3200-N-BT, at 5

(N.D. Tex. July 28, 2020) (Godbey, J.) (denying applicability of the privilege because,

among other things, "the letters sought to enforce [defendant's] contractual legal right

against [a third party], not its legal rights against [the plaintiff]").  The privilege is thus

wholly inapplicable to defendants' conduct.

  If there were any doubt as to whether the communications were related to the

proceedings, the Court would resolve that doubt in the defendants' favor.  But there is none.

If a newspaper's coverage of a press release issued by AWS and containing the same

statements as those in the advertisement would destroy the privilege, so too must a paid

advertisement in the same paper's pages.  The Court will not draw lines between the paid

and unpaid column inches of a newspaper.  Allowing the defendants to invoke the privilege

would allow the exception to swallow the rule.

  There are yet other reasons to conclude that the privilege is inapplicable.  The

*Burzynski* court also considered whether the privilege should be denied where a publisher

"purposely seek[s] to exploit the discovery privilege for ulterior, malicious motives."  967

F.2d at 1068.  The communications in that case encouraged the recipients not to do business

with Burzynski.  On that basis, the court said that it could not "say that both malicious intent and the ulterior motive are not present."  *Id.* at 1069.  The Supreme Court of Texas adopted this theory in 2015:  "The privilege is lost if abused, such as when the statement is made with malice and with knowledge of its falsity."  *Shell Oil Co.*, 464 S.W.3d 650, 655 (Tex. 2015) (quoting *Hulburt*, 749 S.W.2d at 768).  Yet again, other courts agree.[13]

A reasonable jury could conclude, based on ample evidence, that that an ulterior motive lies behind the advertisements.  Sandel's first draft of the advertisement omitted "INFORMATION" from the first line; only after one of the newspapers encouraged Aztec to add the word "INFORMATION" was it included.  Dkt. No. 117 at 303–04, 307.  That speaks for itself.  If more were needed, the Court would point to the fact that before the ads were placed, AWS had certified in the Gaines County litigation that all conditions precedent to suit—including notice to interest holders—were fulfilled.  *See* Dkt. Nos. 101-5 at 14–18, 92–94; 101-6 at 1.  The Court would also point to the advertisements' juxtaposition of Harrison—who, together with HLA&D, owed the defendants $0—with Burkett—who, through his companies, owed the defendants $1.4 million.  And the Court would note that the defendants had Harrison's phone number and e-mail at all times relevant to this litigation, and that the defendants undertook no further investigation of Harrison or HLA&D between the undelivered letter and the publication of the advertisements.  Dkt. No. 117 at 284–98, 377–78.

If that were still insufficient, the Court would point out that the theoretical underpinnings of the privilege—that society wants full and frank litigation—are actively

---

[13] *See Novoselsky v. Brown*, 822 F.3d 342, 353 (7th Cir. 2016) ("Statements are privileged even if they are not confined or relevant to the specific issues of the litigation.  They may not, however, be 'inflammatory matters entirely unrelated to the litigation.'") (citations to Illinois cases omitted).

undermined by conduct like the defendants'.  *See Landry's*, 631 S.W.3d at 49 (The judicial-proceedings privilege . . . does not exist to promote publicity or public awareness outside the courtroom.  Its purpose is to facilitate open and vigorous litigation of matters inside the courtroom.").  How the legal system or the parties are better served by litigating cases quite literally in the papers rather than in court is unclear.  "[I]ndeed, it would serve no purpose but to provide immunity to those who would inflict upon our system of justice the damage which litigating in the press generally causes:  poisoning of jury pools and bringing disrepute upon both the judiciary and the bar."  *Rothman v. Jackson,* 49 Cal. App. 4th 1134, 1148–49 (1996).  As it stands, this Court will have to conduct inquiries to determine whether members of the venire saw the advertisements.  And the concern that parties should not be chilled from bringing litigation by the threat of a defamation action is wholly inapplicable when the public statements that the defendant seeks to protect were made *after the commencement of the allegedly related litigation.  See, e.g.*, *Crowel v. Herring*, 392 S.E.2d 464, 468 (S.C. 1990) ("The threat of a civil action in slander or libel would undoubtedly have a chilling effect on those tempted to initiate legitimate investigations or inquiries into others' supposed wrongdoings.").  Here, AWS had already began the process of recovering the amount owed to it and had sworn under oath that it had complied with all conditions precedent to doing so when the advertisements were purchased.  It is impossible to deter an event that has already unfolded.

    Sandel testified that his attorneys advised him that they had an obligation to do everything possible to serve Harrison and Burkett with notice of intent to foreclose on the lien.  The Court will not presume that the Texas Supreme Court compels such an unsound conclusion:  that to preserve an oil subcontractor's rights to foreclose on a lien, the

subcontractor may publish incendiary and misleading advertisements in regional newspapers in an effort to gain information already in the author's possession and unnecessary to pending litigation.  To assume that Texas courts would countenance such an escalation—from two failed service attempts to the advertisements placed by Aztec—would require the Court to presume that Texas courts are illogical and impetuous.  They are neither.  The defendants may not invoke the judicial-proceedings privilege.

Nor may they preclude further proceedings in this Court by filing an appeal.  Fifteen months ago, the Court concluded "that the litigation privilege does not apply to the advertisements."[14]  Dkt. No. 57 at 13.  With the benefit of discovery, the Court renews that conclusion for all the reasons explained above.  The privilege is plainly inapplicable here.  The defendants knowingly published materials seemingly designed to impugn Harrison in the eyes of the public.  And, according to the testimony of various deponents, they succeeded despite neither Harrison nor HLA&D owing the defendants a penny.  Cases are tried in courts, not the press.  The defendants chose to do both, something the law does not allow.  *See Landry's*, 631 S.W.3d at 48 ("Statements to the media, by definition, are not made within a judicial proceeding.  They are not directed to the court or the opposing party, and they play no formal role in the adjudicatory process.").  Because the defendants' argument on the applicability of the absolute litigation privilege is frivolous, any interlocutory appeal would be, too.  The Court will retain jurisdiction over this case unless and until the Fifth Circuit orders otherwise.  *See BancPass*, 863 F.3d at 398–400 (citing *Apostol v. Gallion*, 870 F.2d 1335, 1340 (7th Cir. 1985) (Easterbrook, J)).

---

[14] The defendants may well have waived any right to interlocutory review by failing to timely appeal the Court's September 2020 ruling on the same issue.  Regardless, their failure to do so then underscores how dilatory such an appeal would be now.

*                    *                    *

Seven months ago, the Texas Supreme Court reiterated what has been the law in Texas since at least 1927:  that "the privilege accorded a litigant which exempts him from liability for damages caused by false charges made in his pleadings, or in the court in the course of a judicial proceeding, cannot be enlarged into a license to go about in the community and make false and slanderous charges against his court adversary and escape liability for damages caused by such charges on the ground that he had made similar charges in his court pleadings."  *Landry's*, 631 S.W.3d at 48 (quoting *De Mankowski*, 300 S.W. at 122).  It follows that Aztec may not hide behind the privilege to go about in the community and make false statements about someone who is *not* a court adversary.  The defendants' motions for summary judgment on the basis of the litigation privilege are denied.

### B.    Harrison's Reputation

The defendants move for summary judgment on the basis that Harrison is libel proof. *E.g.*, Dkt. No. 156 at 9.

"It has long been the rule . . . that the plaintiff's tarnished reputation may be shown in mitigation of damages.  The libel[-]proof plaintiff doctrine is the logical conclusion to be drawn from the principle underlying that rule: where there is no reputation it cannot be damage[d] and without damage to reputation there is no actionable defamation."  *Finklea v. Jacksonville Daily Progress,* 742 S.W.2d 512, 517 (Tex. App.—Tyler 1987, writ dism'd w.o.j.). "The libel-proof doctrine," which is based on the premise that defamation is not actionable without damage to the plaintiff's reputation, was first announced in *Cardillo v. Doubleday & Co., Inc.,* 518 F.2d 638 (2d Cir. 1975).  A libel proof plaintiff, by definition, has "suffered

– 40 –

minimal, if any, damage to his reputation by a defamatory communication." *Langston v. Eagle Publ'g Co.,* 719 S.W.2d 612, 621 (Tex. App.—Waco 1986, writ ref'd n.r.e.)."

"[T]he libel-proof doctrine has developed into two distinct pathways." *Id.* The first path, called "issue-specific," "bars libel claims of plaintiffs who have tarnished reputations on particular issues or on a specific behavior." *Id.* The second path, referred to as the "incremental" approach, "requires the court to evaluate the defendant's communication in its entirety and to consider the effects of the challenged portion of the communication on the plaintiff's reputation in the context of the entire communication." *Id.* at 622.

To justify applying the doctrine, "the evidence of record must show not only that the plaintiff engaged in criminal or anti-social behavior in the past, but also that his activities were widely reported to the public. The evidence on the nature of the conduct, the number of offenses, and the degree and range of publicity received must make it clear, as a matter of law, that the plaintiff's reputation could not have suffered from the publication of the false and libelous statement." *McBride v. New Braunfels Herald-Zeitung*, 894 S.W.2d 6, 10 (Tex. App.—Austin 1994, writ denied) (citations omitted). "The cases that most compellingly invite . . . [the doctrine's] application are those cases . . . in which criminal convictions for similar behavior to that alleged in the challenged communication are urged as a bar to the claim." *Finklea,* 742 S.W.2d at 515. "[A] substantial majority of the reported cases [probably] relate to the specific issue of the plaintiff's criminal conduct." *Id.* Thus, "[i]t is clear that the doctrine should have only a limited application[.]" *Id.* at 516. "In determining in what matters or issues it is impossible to defame the plaintiff, most cases invoking the doctrine narrow its application to those instances in which the challenged statement erroneously describes behavior similar or identical to that for which the plaintiff has been

conclusively shown to be guilty." *Id.* In short, "[t]here are few so impure that cannot be traduced. Although a person's general reputation may be so bad as to render him libel[-]proof on all matters, ordinarily even the public outcast's remaining good reputation is entitled to protection." *Id.*.

Jay Norton's testimony makes clear that Harrison is not libel-proof. When asked "Do you have any personal knowledge about Stacey Harrison as a person?" he answered, "No." Dkt. 186 at 313. Norton works in the oil and gas industry. If Harrison is unknown by someone in his own industry, his reputation is certainly not so sullied as to preclude recovery. And there is ample evidence that Harrison is not a "public outcast." Affidavits make clear that Harrison is a well-liked and respected member of his community who is perennially reelected as a trustee of his church and active in civic life. Dkt. Nos. 164 at 14–15; 186 at 7–13; *see, generally, Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160–61 (5th Cir. 2021) (reiterating that self-interested affidavits are competent summary judgment evidence). And when Alvin Jarrett was asked "Do you recall anyone ever telling you that 'Stacey Harrison has not paid me'?" he responded in the negative, but said that Burkett's "name came up a lot." Dkt. No. 164 at 320. Harrison has furnished ample evidence that he is not libel-proof, so the defendants are not entitled to summary judgment on that basis.[15]

### C.    Sandel's Liability

Sandel seeks summary judgment on the basis that he was acting as the agent of AWS and Triple S when he sent the letter. Dkt. No. 162 at 3–4. Since AWS and Triple S confirm

---

[15] Given that the plaintiff has no burden to plead and prove actual damages in such cases, it is unclear whether a defendant could ever prevail at summary judgment in a case of defamation per se by arguing that the defendant is libel-proof.

that account, Dkt. No. 156 at 5, Sandel argues he is off the hook in his personal capacity. *Id.* at 4.

Copious authority disproves that proposition. The longstanding rule in Texas is that "a corporate agent is personally liable for his own fraudulent or tortious acts." *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002). Thus, if a corporate agent directs or participates in a tort during his employment, he faces personal liability for the tortious act. *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984). "Accordingly, regardless of whether [Sandel] performed the alleged tortious acts as [a] corporate agent[], as a general matter, [he] can still face individual liability for those acts if they prove to be tortious." *Petrobras America, Inc. v. Astra Oil Trading NV*, 633 S.W.3d 606, 629 n.24 (Tex. App.—Houston [14th. Dist.] 2020, pet. filed) (citing *Miller*, 90 S.W.3d at 717–18 and *Leyendecker*, 683 S.W.2d at 375).

This is true even for an Executive Vice President like Sandel: "[W]hen actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself," and "status as a vice-principal of the corporation is sufficient to impute liability to [the corporation] with regard to his actions taken in the workplace." *Bennett v. Reynolds*, 315 S.W.3d 867, 883–84 (Tex. 2010) (alterations in original) (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999)). "Vice principal" encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 922 (Tex. 1998) (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997)).

The uncontroverted evidence in this case demonstrates that Sandel falls squarely within the definition of "vice principal."  He is a corporate officer to whom managerial employees reports and exercises—in coordination with his father—absolute discretion over the affairs of AWS and its subsidiaries.  A jury may therefore properly conclude that Sandel and AWS are jointly and severally liable for any damages that flow from Sandel's placement of the advertisements on AWS's behalf.

The defendants write that Harrison "absurdly" claims that "all Jason Sandel's actions are those of both himself and every single entity with which he may be associated." Dkt. 199 at 4–5.  Aside from mischaracterizing Harrison's position, the defendants' statement casts aspersions on the Texas law that amply supports it.  To be sure, not *every* act an individual undertakes is attributable to the individual's employer.  But intentional torts undertaken within the scope of an individual's employment are the employer's responsibility.  Restatement (Second) of Agency § 348 (1958).  Sandel is incorrect to suggest otherwise, and summary judgment will be denied accordingly.[16]

### D.    Joint Enterprise

Double M, Totah, and Roadrunner seek summary judgment on the basis that they published no statements.  Dkt. Nos. 100 at 4–5; 159 at 3–5.  Sandel does, too, Dkt. No. 162 at 4, but for reasons explained above, that motion fails.  In his complaint, Harrison seeks a declaratory judgment that the defendants are a joint enterprise.  Dkt. No. 77 at 18.  He did not move for summary judgment on that claim, however, and he bears the burden of

---

[16] This conclusion should come as no surprise to Sandel given the Court's prior ruling on personal jurisdiction.  *See* Dkt. No. 62 at 6.

proving that at trial.  If the defendants are a joint enterprise—if the "Aztec Well Family" exists—then Double M, Totah, and Roadrunner's fates will rise and fall with AWS's.

All of the defendants have moved for summary judgment on Harrison's declaratory judgment claim.  *E.g.*, Dkt. No. 156 at 6–8.[17]  They correctly point out that the Declaratory Judgment Act, codified at 28 U.S.C. § 2201, does not establish an independent cause of action.  *Id.* at 6 (citing *Aetna Life Ins. v. Haworth*, 300 U.S.227, 240 (1937)).  They continue that, because Harrison has, in their eyes, failed to state a claim for defamation, his declaratory judgment claim must fail, too.  *Id.*  But the Court has already explained why a jury will determine whether the advertisements are false and therefore defamatory per se, so the no-independent-cause-of-action theory offers the defendants no relief.  *See supra* at 3.C.i. The defendants alternatively argue that Harrison cannot meet his burden to show that the defendants are a joint enterprise.  Dkt. No. 156 at 6–8.  They move for summary judgment accordingly.

To prevail on their motions for summary judgment, the defendants need only show that there is no admissible evidence to support one part of Harrison's claim of joint enterprise.  To avoid summary judgment against him, Harrison must then proffer specific facts indicating that there is a genuine issue for trial.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Viewing the evidence in the light most favorable to Harrison, the Court concludes that he has done so in spades.  Accordingly, the defendants' motions for summary judgment on the declaratory judgment claim must fail.

---

[17] Query why AWS and Triple S would seek to establish that the Aztec Well Family does not exist.

### i.    Governing Law

"The theory of joint enterprise is to make each party thereto the agent of the other and thereby to hold each responsible for the negligent act of the other." *Shoemaker v. Est. of Whistler*, 513 S.W.2d 10, 14 (Tex. 1974).  Texas courts adopted the Second Restatement's definition of joint enterprise:  "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Id*. at 16–17 (quoting Restatement (Second) of Torts § 491, cmt. c ); *Triplex Commc'ns, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex. 1995).  Evidence of shared officers, directors, employees, business addresses, and assets are insufficient to demonstrate joint enterprise where the other requirements are left unmet. *Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 626 (Tex. App.—Fort Worth 2011, no pet.).

### ii.    Analysis

As a preliminary matter, the defendants' unsupported assertion that the joint-enterprise theory of liability applies only to unintentional torts, *e.g.*, Dkt. No. 156 at 7–8, is incorrect. *See* Dkt. No. 100 at 8 & n.45 (Roadrunner's motion for summary judgment citing *David L. Smith & Assocs., LLP v. Stealth Detection, Inc.*, 327 S.W.3d 873 (Tex. App—Dallas 2010, no pet.), a case analyzing joint-enterprise liability in the context of an intentional violation of the Telephone Consumer Protection Act).

### a.    Express or implied agreement

Harrison provides ample evidence that there is an express or implied agreement amongst the Aztec Well Family companies.  The use of shared services and common

marketing materials essentially precludes the corporate defendants from arguing otherwise.
The corporate defendants may have different bank accounts and incorporation documents,
but they have voluntarily elected to hold themselves out to the world as a family through
marketing materials, letterhead, business cards, and their digital presence.  Having marketed
themselves and operated as a family, equity and common sense amply support the
conclusion that, when the advertisements were bought and signed by "The Aztec Well
Family," they came from all of the entities who hold themselves out as members of the
Family.  Harrison has presented evidence to support a finding of an agreement amongst the
corporate defendants.

### b.    Common purpose

Harrison likewise demonstrates a genuine dispute of material fact as to whether there
is a common purpose for the enterprise.

The corporate defendants hold themselves out as the Aztec Well Family in
promotional materials.  They share services.  They share an office.  They share an address.
They share a phone number.  They share a business manager and a legal department.  They
appear beneath "The Aztec Well Family" on their contracts.  They furnish services under
contracts to which they are not a party.  And, most importantly, the Aztec Well Family
signed and paid for the advertisements at issue here.  The purpose of the agreement to
participate in the Aztec Well Family was clearly to reduce overhead costs, thus facilitating
price competition.  A jury could undoubtedly conclude that, by pooling their resources to
hire one, skilled business manager, the companies were able to share in the benefits of
skilled labor without bearing the full costs of independently retaining a business manager of

Luay's skill.  So, too, for marketing, legal, and IT services, which were all shared.  Harrison

has thus demonstrated ample evidence in support of the Family's common purpose.

Moreover, the evidence supports the Family's purpose in pursuing repayment.

Sandel's e-mails with Harrison and Burkett attempting to negotiate repayment of the debt

simultaneously use "our companies" and "a small business" and note that "it is hurting our

business and threatening our survival."  Dkt. No. 164 at 356–59.  Sandel also lumps debt

owed to different companies—some to Triple S, some to Aztec Drilling—into one sum

owed to "Aztec Well."  *Id*.  A reasonable jury could conclude that the Family members

acted as one to ensure the Family's "survival" when placing the ads.

### c.      Community of pecuniary interest

Harrison also demonstrates a genuine issue of material fact as to whether there is a

community of pecuniary interest among the defendants.

The ordinary meaning of pecuniary is "of or pertaining to money."  *St. Joseph*

*Hospital v. Wolff,* 94 S.W.3d 513, 531 (quoting Webster's New Universal Unabridged

Dictionary 1428 (1996)).  Thus, the third element of joint enterprise requires a monetary

interest common among the members of the group; it must be one "shared without special

or distinguishing characteristics."  *Id.* (quoting *Ely v. Gen. Motors Corp.,* 927 S.W.2d 774, 779

(Tex. App.—Texarkana 1996, writ denied)).  "Indirect, potential financial interests do not

satisfy the test."  *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 850 (Tex. App.—Fort

Worth 2006, no pet.); *Blackburn v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.*, 58 S.W.3d

263, 276 (Tex. App.—Fort Worth 2001, pet. denied) (explaining that "evidence of such

general benefits does not establish a community of pecuniary interest in the common

purpose to be carried out by the group"); *Ely v. Gen. Motors Corp.,* 927 S.W.2d 774, 779 (Tex.

– 48 –

App.—Texarkana 1996, writ denied) (holding wholesaler and retailer do not share community of pecuniary interest). "The investment of time and money to fulfill a common purpose . . . does not render that purpose 'pecuniary' in nature." *Wolff,* 94 S.W.3d at 533.

Texas courts have "reject[ed] the mere existence of common owners, officers, and employees as proof of community of pecuniary interest." *Omega Contracting*, 191 S.W.3d at 850. "To hold otherwise would tend to subject companies to joint venture liability whenever they shared an employee, an officer, or even a shareholder." *Id.* "[W]hether parties have a 'common business or pecuniary interest' . . . is not the same as whether they have a 'community of pecuniary interest,' as required by *Shoemaker* and the Restatement." *Wolff*, 94 S.W.3d at 528. For example, "a franchisor, wholesaler, or supplier usually does not have a 'community of pecuniary interest' in the retail sales of its respective franchisees, retailers, or customers" because "[a]lthough the former entities stand to benefit financially from the successful downstream marketing of their goods or services, their interests in those activities are not held in 'community' with the members of the latter group because they are not shared 'without special or distinguishing characteristics.'" *Id.* In comparison, the existence of pooled funds or services supports the inference that there is a community of pecuniary interest. *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 614 (Tex. 2000).

Here, there is a genuine dispute of material fact as to whether there is a community of pecuniary interest among the Aztec Well Family companies. As explained above, many resources and functions were shared by the companies—that undoubtedly leads to savings for all five. There is evidence in the record that, although not signatories to the contract between AWS and Copper Ridge, Triple S and Totah provided services to Copper Ridge. Dkt. No. 101-6 at 166 (Triple S bills for Copper Ridge); 101-6 at 13 (Totah bills for Copper

Ridge).  Those records demonstrate that AWS was billed by subsidiaries to a "rebill"

account at AWS, suggesting AWS was a  conduit for the expenses and revenues of the

subsidiaries.  Dkt. No. 101-6 at 13.  AWS's ability to lien-up the property may have had a

direct effect on the subsidiaries' ability or need to pursue independent action against Copper

Ridge.  Moreover, it is not, strictly speaking, true that Roadrunner's name appeared

nowhere on the contract, *contra* Sandel's testimony, Dkt. No. 117 at 89, 113–14:  It is on the

first page, just beneath the large "The Aztec Well Family" logo.  Dkt. No. 101-1 at 54.

Furthermore, Totah Equipment "has equipment and supplies that are utilized by Triple S

Trucking and Aztec Well Servicing."  Dkt. 117 at 234.  To be sure, the corporate defendants

maintained separate bank accounts.  But they loaned one another money, shared services

and management employees, and there is evidence to suggest that they provided

extracontractual services to one another.

Even as it relates to this specific dispute, there is evidence to support a community of

pecuniary interest.  In a May 2, 2019, e-mail to Burkett and Harrison, Sandel wrote "we

must get a clear path forward as it relates to payment for services rendered to Copper Ridge

*by our companies*."  Dkt. No. 164 at 357.  He went on:  "I am hopeful that you understand

that we simply cannot function as a small business with this much debt being extended for

as long as it has been.  Frankly, it is hurting *our business* and threatening *our survival*."  *Id.* at

358 (emphasis added).  Sandel's e-mail signature block follows:

```
Jason Sandel
Executive Vice President/CVO
The Aztec Well Family
Post Office Box 100 / 300 Legion Road
Aztec, New Mexico 87410
            (voice)
            (mobile/text)
      @aztecwell.com
```

*Id.* at 306 (redactions by the Court).  None of the defendants explains how Sandel is the

"Executive Vice President/CVO" of something that, in his words, "doesn't exist," Dkt. No.

117 at 28.  Regardless, there is ample evidence to support a jury's conclusion that the

defendants shared a community of pecuniary interest in the debt owed by Copper Ridge.

### d.   Equal right of control

And Harrison has demonstrated a genuine issue of material fact as to whether the

defendants had an equal right of control.

"The right of control is ordinarily a question of fact."  *Sparger v. Worley Hosp., Inc.*,

547 S.W.2d 582, 583 (Tex. 1977).  "[T]he equal-right-to-control element means 'that each

[participant] must have an authoritative voice or . . . must have some voice and right to be

heard.'"  *Able,* 35 S.W.3d at 614 (quoting *Shoemaker,* 513 S.W.2d at 16).  The "critical

inquiry" in analyzing the equal-right-of-control element is whether the defendant charged

with joint enterprise liability had the right to control the tortfeasor at the time of the tortious

conduct.  *Omega Contracting, Inc.*, 191 S.W.3d at 851 (citing *Ely*, 927 S.W.2d at 780).  So, for

example, there is no evidence of an equal right to control when a radio station and a

nightclub agreed to sponsor a "ladies' night" promotion, but the nightclub controlled who was admitted or ejected from the club and how much alcohol to serve, at what price, and to whom. *See Triplex Commc'ns, Inc.,* 900 S.W.2d at 719.

Jason Sandel is the Executive Vice President of Aztec Well Servicing, Triple S, Double M, Totah, and Roadrunner. Dkt. No. 164 at 381. He serves on AWS and Roadrunner's boards. Dkt. No. 117 at 205, 67. He and his father share authority and control over all of the companies. *Id.* at 190–91. He directed that the ads be placed. *Id.* at 278–79. He was the only person who could authorize the placement of the ads. *Id.* at 280. He chose the language for the ads. *Id.* at 303–04. He signed the ads "The Aztec Well Family." His business card says, "The Aztec Well Family." *Id.* at 215. So does the marketing material uncovered in discovery. *Id.* at 405. So does his LinkedIn. *Id.* at 217–18. So does his e-mail signature, the same one he used to negotiate the debt owed to "our companies." Dkt. No. 164 at 356. So did the contract he signed with Copper Ridge. Dkt. No. 101-1 at 54. So did the letter that he sent to Wanda Harrison. *Id.* at 33. So did the envelope it came in. *Id.* at 42–43. So did the bill from the newspapers. Dkt. No. 117 at 401–02.

All of this evidences that each of the companies, through their officers—all of whom happen to be Jason Sandel—could have intervened to stop Jason Sandel or retract the ad that was published, at least in part, in their name. If Sandel, in his official capacity for each of the corporate defendants, could have placed the advertisements, his decision in his official capacity to not retract the advertisements is evidence of equal voice and control. *See* Dkt. No. 117 at 78–79 (Sandel testifying in his official capacity at Roadrunner that he would have had the power to review brochures in which its name appears under the Aztec Well

Family moniker); *but see also id*. at 83 (Sandel testifying, despite his prior testimony and the record evidence, that Roadrunner does not market itself as a part of the Aztec Well Family). Harrison has thus presented evidence sufficient to support a jury's verdict on the fourth prong, as well.

*          *          *

Despite the signature on the advertisements, the defendants maintain that they are not one entity. Sandel had the following exchange with Harrison's counsel during his deposition as Roadrunner's corporate representative:

> Q.   Roadrunner's Web site says, "Our large fuel tanks provide fuel for the local community as well as our company vehicles."
>      What does that mean?
>
> A.   I believe that it's pretty plain. It provides fuel for the community and for our company vehicles, whoever wants to buy it.
>
> Q.   Does that mean "our company," as in Roadrunner, or "our company," as in the five companies that are pooling resources?
>
> A.   It means whoever wants to buy it.
>
> Q.   What does "our company" represent?
>
> A.   "Our company" represents Roadrunner Fuels; it represents the other companies that are sisters to Roadrunner Fuels, who are Triple S Trucking, Double M, Totah, and Aztec.
>
> Q.   So, essentially, "our company" indicates The Aztec Well Family, correct?
>
> A.   No, it does not.
>
> Q.   Why does it not?
>
> A.   Because The Aztec Well Family is not real.

Dkt. No. 117 at 50–51 (objections omitted).

A jury will decide whether to believe Sandel. The defendants' motions for summary judgment on the grounds that they are not a joint enterprise are denied.

### E.     Defamation Mitigation Act

Triple S, Double M, Totah, Roadrunner, and Sandel all argue that Harrison failed to comply with Texas's Defamation Mitigation Act.  *E.g.*, Dkt. No. 159 at 5; *see* Tex. Civ. Prac. & Rem. Code § 73.051 et seq.  The thrust of their argument is that the retraction request was addressed to "Jason Sandel" at "Aztec Well Service" rather than each and every one of the defendants.

This is how Harrison addressed his retraction request:

**Stacey Harrison**
5125 Crystal Creek
Abilene, Texas 79606

November 18, 2019

Jason Sandel
Aztec Well Service
PO Box 100
Aztec, New Mexico 877410


                                        Re:     Request for Retraction
                                                The Aztec Well Family

Mr. Sandel,

Dkt. No. 164 at 183.  To be sure, the letter is addressed to Sandel at AWS.  But the subject line makes clear that it was a "Request for Retraction" directed to "The Aztec Well Family."  The request was sent to the address listed on the advertisements for "The Aztec Well Family."  And, of course, the advertisements were signed "The Aztec Well Family."  The "publisher," *see* Tex. Civ. Prac. & Rem. Code § 73.055(d)(1), was therefore served with a timely and sufficient request under the DMA.  Of course, the DMA is only relevant to the

extent that the defendants are correct that they are not a joint enterprise, for a demand to one would constitute a demand to all.  *See* Tex. Civ. Prac. & Rem. Code § 73.060.

Even if the jury concludes that the defendants are not a joint enterprise and that the defendants—other than AWS—did not receive proper notice under the DMA, the remaining remedy available to the defendants is limited to the context of damages.  The Texas Supreme Court recently issued a detailed set of opinions on the Defamation Mitigation Act.  *Hogan v. Zoanni*, 627 S.W.3d 163 (2021).  But none of those opinions commanded a majority of the Court.  A majority of justices did, however, conclude that the remedy available to a defendant who does not receive any retraction demand under the DMA is not dismissal, but abatement.  *Id.* at 176–77 (plurality), 187 (Justice Boyd's concurrence in the judgment).  That is the rule this Court will apply.

The entirety of the moving defendants' argument is that they received no demand— not that they received an untimely or insufficient demand.  *E.g.*, Dkt. No. 159 at 5.  Their sole remedy, under *Hogan*, was to ask the Court to abate the litigation.  They did not do so. Thus, they are not entitled to summary judgment on the basis of the DMA.

The defendants urge that, even if the Court concludes that they are not entitled to judgment by dint of the DMA, Harrison's noncompliance precludes recovery of exemplary damages.  The DMA seems to permit recovery of exemplary damages where actual malice is shown regardless of whether a defendant received a proper retraction request.  *See* Tex. Civ. Prac. & Rem. Code § 73.059.  But the Court reaches no conclusions as to that issue because this is a case of defamation per se.

**5.    Conclusion**

Everyone agrees that Stacey Harrison does not owe the defendants, in his words, "a red cent." Dkt. No. 164 at 43. Nevertheless, "The Aztec Well Family" ran advertisements in the style of wanted posters in local papers stating that they were looking to "legally serve" Harrison in an "effort to collect millions in outstanding debt." Although the Court has its own view as to the advertisements' "gist," it is for a jury to decide whether the defendants defamed Harrison. Likewise, the jury will decide whether the defendants are a joint enterprise. The jury will not, however, hear Harrison's slander claim.

Harrison's motion for partial summary judgment (Dkt. No. 135) is denied. The defendants' motions for summary judgment (Dkt. Nos. 99; 155, 158; 161) are granted as to the slander claim and are denied in all other respects.

So ordered on December 23, 2021.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE