UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

STACEY HARRISON, et al.,

      Plaintiffs,

v.

AZTEC WELL SERVICING CO., INC.,
et al.,

      Defendants.

No. 1:20-CV-038-H

**MEMORANDUM OPINION AND ORDER**
**ON MOTIONS TO STRIKE THE EXPERT WITNESSES**

Trial approaches.  The parties designated experts to testify on damages.  Each side has moved to strike the other's expert.  Both motions are denied in part and granted in part.

The bulk of the damages the plaintiff seeks to recover seems to stem from the demise of a planned well-development partnership with a group of investors, Tri-Capital.  Harrison alleges that various oilfield-services companies stopped working with him in the wake of the publication of the allegedly defamatory advertisements by the defendants.  That, in turn, led to the failure of two wells that were to serve as proof-of-concept for Harrison's new venture with Tri-Capital.  When those wells failed—and, perhaps, when it learned of the advertisements—Tri-Capital pulled out.  Or so Harrison says.  A jury will make the final call as to causation.

Which is why Jacob Adams—the plaintiff's expert, a CPA—may not testify as to causation or falsity.  He may, however, testify as to the value of the Tri-Capital deal to Harrison.  Bradley Ewing—the defendants' retained economist—may, in turn, critique Adams's methodology and conclusions.  But Ewing's unsupported conclusion that Harrison suffered no "economic loss" to his "knowledge resource" is inadmissible.

1.      **Background**

The Court's opinion on summary judgment details the factual and procedural

background of this case.  Dkt. No. 235 at 2–12.  In short, the plaintiff alleges that the

defendants defamed him by placing a series of advertisements in the style of wanted posters

in local newspapers.[1]  The advertisements intimated that the plaintiff owes the defendants

millions of dollars.  The main questions for the jury are whether the advertisements' gist is

true or false and whether the defendants may be held liable under a joint-enterprise theory.

If necessary, the jury will also determine what damages are attributable to the defendants'

conduct.

The present disputes focus on that question.  Specifically, what expert testimony the

jury will hear as to damages.  After outlining the governing law, the Court addresses the

motions to strike, starting with the defendants' motion to strike the plaintiff's expert.

2.      **Legal Standards Governing Expert Testimony**

The Federal Rules of Civil Procedure and Evidence—not the Texas Rules—govern

in federal diversity jurisdiction cases.  *See Grenada Steel Indus., Inc. v. Ala. Oxygen Co., Inc.*,

695 F.2d 883, 885 (5th Cir. 1983) (holding that in a diversity action, federal courts apply

federal procedural law, including the Federal Rules of Evidence).  Rule 26(a)(2)(B) requires

that an expert report contain: (i) a complete statement of all opinions the witness will

express and the basis and reasons for them; (ii) the data or other information considered by

the witness in forming them, (iii) any exhibits that will be used to summarize or support

them; (iv) the witness's qualifications, including a list of all publications authored in the

---

[1] The Court granted summary judgment on the plaintiff's slander claim but did so after briefing on
the instant motions, so some portions of the expert reports are moot.

previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.  Rule 26(a)(2) is designed to impose a "duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.  *Lofton v. McNeil Consumer & Specialty Pharms.*, 3:05-CV-1531-L-BH, 2008 WL 4878066, at *10 (N.D. Tex. July 25, 2008) (quoting Rule 26 advisory committee's note to 1993 Amendments) (Ramirez, M.J.).

The admissibility of evidence is a procedural issue governed by federal law.  *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985).  Federal Rule of Evidence 702 determines the admissibility of expert testimony as evidence.  Rule 702 permits opinion testimony from a witness "'qualified as an expert by knowledge, skill, experience, training, or education' if the expert's knowledge will assist the trier of fact and (1) 'the testimony is based on sufficient facts or data,' (2) 'the testimony is the product of reliable principles and methods,' and (3) 'the expert has reliably applied the principles and methods to the facts of the case.'"  *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195 (5th Cir. 2018) (quoting Rule 702).

The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  In performing its gatekeeping function, the Court must permit only expert testimony that is reliable and relevant.  *Daubert*, 509 U.S. at 589; *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).  The party offering the expert testimony bears the burden of

proving, by a preponderance of evidence, that the testimony is both relevant and reliable. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002)).

Expert testimony is relevant if it goes to assisting the trier of fact to understand the evidence or to determine a fact in issue. *Daubert*, 509 U.S. at 591. Federal Rule of Evidence 401 further clarifies that evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without evidence" and if "the fact is of consequence in determining the action." *See Mathis*, 302 F.3d at 460 (applying Rule 401 to expert testimony). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid. 702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

And expert testimony is reliable if "the reasoning or methodology underlying the testimony is scientifically valid." *Knight*, 482 F.3d at 352 (citing *Daubert*, 509 U.S. at 592–93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight*, 482 F.3d at 355. Such testimony must be "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. In other words, the Court need not admit testimony "that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Court also need not admit testimony based on indisputably wrong facts. *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

In conducting its reliability analysis, the Court focuses on the reasonableness of the expert's approach regarding the matter to which his testimony is relevant and not on the conclusions generated by the expert's methodology. *Daubert*, 509 U.S. at 595; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153–54 (1999). Thus, "[t]he proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). If, however, "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the Court may exclude the testimony as unreliable. *General Elec. Co.*, 522 U.S. at 146. The Court normally analyzes questions of reliability using the five nonexclusive *Daubert* factors: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94. Regardless, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee's notes to 2000 Amendment.

The gatekeeping function under *Daubert* and its progeny applies only to the expert testimony's admissibility; it does not extend to its weight, which is properly left to the jury. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996). "Courts routinely reject challenges to the admissibility of expert testimony based on arguments that the expert failed to take into account certain data in forming his or her opinions." *Blottin v. Mary Kay Inc.*, No. 3-10-CV-1905-M-BD, 2012 WL 13026814, at *3 (N.D. Tex. Aug. 22, 2012)

(Kaplan, M.J.); *see Browning v. Southwest Research Inst.*, No. SA-05-CA-0245-FB, 2006 WL 6549921, at *2 (W.D. Tex. Aug. 17, 2006) (collecting cases). Indeed, "it is the role of the adversarial system, not the court, to highlight weak evidence." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004). *Daubert* is therefore not a replacement for the adversarial process embodied in a trial on the merits. *Mathis*, 302 F.3d at 461 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *14.38 Acres of Land*, 80 F.3d at 1078; *accord Dearmond v. Wal-Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009) ("Cross-examination at trial . . . is the proper forum for discrediting testimony, and credibility determinations are, of course, the province of [the fact finder]."). Thus, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

### 3.   Plaintiff's Expert[2]

Harrison designated Jacob W. Adams as an expert as to the damages Harrison incurred by virtue of the defendants'[3] placement of the advertisements. Dkt. No. 90 at 1. Adams is a CPA who "specializes in financial, economic, and accounting analyses related to complex commercial litigation, investigations, and arbitration matters." *Id.* The defendants' law firm has previously retained Adams as an expert, so they understandably do

---

[2] Both sides attached Adams's report to the motion, response, *and* reply, even though the report was previously filed with the Court. Duplicative filings are unhelpful and unnecessary.

[3] The defendants will undoubtedly balk at the Court's use of the plural here. But the Court has reached no conclusions as to joint-enterprise liability. Rather, it sacrifices precision for brevity.

not challenge Adams's qualifications as an accountant.  Dkt. No. 169 at 2.  Instead, they challenge Adams's report as unreliable and likely to confuse the jury.  Dkt. No. 140 at 9–10.

Adams's report addresses several issues.  First Adams writes that, "[f]rom an accounting perspective, the Wanted Ads published by the Defendants contained incorrect information about the Plaintiff."  Dkt. No 91 at 5, 10–17.  Second, Adams concludes that, "[b]ut-for the Defendants' publication of the Wanted Ads and their communications with the Plaintiff's vendors, the Plaintiff's deal with Tri-Capital would have resulted in a value to the Plaintiff ranging from $13.1 million to $21.9 million."  *Id.* at 5, 18–39.  Finally, Adams opines that "[b]ut-for the Defendants' actions, the Plaintiff would not have incurred long-term reputational damage."  *Id.* at 5, 39–40.

The defendants[4] object *in toto* to Adams's report, arguing that his "opinions are not based on sufficient facts and data and are not of the type reasonably relied upon by economists."  Dkt. No. 140 at 4.  More precisely, the defendants argue that Adams's conclusions do not follow from the evidence he considered and that his opinions are merely legal conclusions by any other name.  *Id.*  The defendants note that Adams's report proceeds by a chain of inferences:  First, Adams assumes that the advertisements caused certain projects Harrison was working on to fail when contractors pulled their services in the wake of the advertisements' publication; Adams then concludes that the failure of those projects— in conjunction with Tri-Capital's learning of the advertisements—led Tri-Capital to end its involvement with Harrison; then Adams analyzes the expected value of the Tri-Capital deal to Harrison to arrive at his final figures.  *Id.* at 5–7.

---

[4] Roadrunner's motion to join (Dkt. No. 141) Aztec's motion to strike (Dkt. No. 140) is granted.

Having considered the motion, response, reply, and governing law, the Court will not strike the entirety of Adams's report.  Adams's report is admissible for its discounted–cash flow analysis of the Tri-Capital deal.  Adams's financial analysis follows generally accepted principles.  The defendants may quibble with the assumptions Adams makes in reaching his final figures; that is what cross-examination is for.  If the jury concludes that the advertisements were the cause of the Tri-Capital deal's demise, the DCF figures will be helpful.

But Harrison may not rely on Adams as an expert for causation—that is, Adams's opinions as to what caused the Tri-Capital deal to fall through are not admissible.  Adams's opinions on the effect of phone calls on Harrison's reputation or ability to secure other opportunities are likewise inadmissible.  So, too, is any testimony from Adams about the falsity of the advertisements from an "accounting perspective"—the Court does not understand that term and, in any event, Adams's conclusions are (1) likely to confuse the jury and (2) would be cumulative with the defendants' admissions because no one contests that Harrison owed the defendants nothing.  *See, generally*, Fed. R. Evid. 403.  The Court will, however, allow testimony from Adams as to the GAAP effect of the e-mail from Harrison to Aztec.

### A.    Permissible Testimony:

#### i.    Adams's opinion as to the Tri-Capital deal's value

Adams's report undertakes a DCF analysis to demonstrate the losses Harrison suffered as a result of the Tri-Capital deal going sideways following the advertisements' publication.  Dkt. No. 91 at 32–33.  A DCF analysis is a commonly used method of valuing an enterprise as a going concern.  Rather than looking to the value of a business's assets, a

DCF approximates the present value of an enterprise's future cash flows, the theory being that the value of an enterprise is the profit it generates for its owners (thus, the "income method"). Other methods of valuing enterprises exist. One could compare Company A to similar firms that have known valuations (either from public markets or private transactions) and then adjust for the differences by comparing metrics such as the comparators' price-to-earnings ratio to the subject firm's (the "multiples method"). Or one could attempt to approximate the cost of replicating the subject firm (the "cost method"). Adams acknowledges the existence of these other methods and explains why a DCF analysis made the most sense for approximating the value of the Tri-Capital deal to Harrison. *Id.* at 32–33.

The defendants write that Adams's report is moral judgment masquerading as an impartial economist's opinion. Dkt. No. 140 at 5–6. But the defendants concede that the valuation contained in Adams's report is beyond the ken of the average person. *Id.* The defendants instead focus their fusillade on Adam's use of "unreliable base numbers" that were "made up by the Plaintiff." *Id.* But "[c]ross-examination at trial . . . is the proper forum for discrediting testimony." *Dearmond v. Wal-Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009). And "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Viterbo*, 826 F.2d at 422. The defendants are free to test Adams's assumptions on cross-examination.[5] There

---

[5] The defendants write, "Interestingly, Adams' damage range for the Tri-Capital Deal alone is higher than the damage range he gives for all of Harrison's speculative damages. Compare Ex. A at 36 with 28." Dkt. No. 140 at 7 n.2 (citing Dkt. No. 91 at 38, 30). Had the defendants' read the rest of page 36 of Adams's report, they would understand there is nothing interesting about this fact. The defendants' observation is explained by subtraction: "In the event the Tri-Capital Deal had closed as projected, Mr. Harrison would have sold his HLAD's interest in Butler #3 and been employed full time with Tri-Capital, thus unable to generate consulting/contractor income. . . . Therefore, it would be appropriate to remove the actual income Mr. Harrison received [from his consulting/contractor income] from the but-for-value he would have received from the Tri-Capital Deal." Dkt. No. 91 at 38.

may be reasons to question the choice of a DCF analysis for a firm which has no revenue—the analysis turns on projections of free cash flows, which a nonexistent firm does not have. But Adams has presented an opinion rooted in reality whose assumptions are testable. He has not relied solely on figures provided to him by Harrison; he has incorporated market conditions, standard discount rates, and the valuations provided by Tri-Capital's independent engineer into his analysis. Dkt. No. 91 at 32–37. Moreover, Adams relied on the letter of intent between Harrison and Tri-Capital rather than Harrison's proposals to Tri-Capital. *Id.* at 9. Whether that letter was a final binding agreement is irrelevant for the Court's present purposes. In Texas, a letter of intent can be an enforceable agreement to agree, or at least a commitment to negotiate in good faith. *See Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237–38 (Tex. 2016); *Karns v. Jalapeno Tree Holdings, LLC*, 459 S.W.3d 683 (Tex. App.—El Paso 2015, pet. denied).[6] Because he showed his work and relied on much more than Harrison's "champagne dreams" (*see* Dkt. No. 177 at 3), Adams's DCF analysis is reliable.

And it is relevant. As defendants concede, the average juror would have no way of determining the present value of the cashflows the Tri-Capital deal was expected to generate. Adams's valuation would therefore be helpful to a jury tasked with arriving at a damages figure. Dkt. No. 140 at 5.

The defendants argue that "[a] mere letter of intent is entirely too speculative to support a damage award. The Tri-Capital Deal never earned a profit. Parties cannot

---

[6] The Court notes that Tri-Capital was based in Delaware. Dkt. No. 91 at 18. If the letter of intent contemplated that any resulting agreement would be governed by Delaware law, then the letter may well be an enforceable agreement-to-agree. *See SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 350–351 (Del. 2013).

recover anticipated profits when 'there is no evidence from which they may be intelligently estimated.'" *Id.* at 7 (quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)).  Explaining why Adams's analysis of the Tri-Capital deal is valuable to the jury requires understanding why the defendants' proposition is incorrect.

Texas law clearly says that, to be awarded as damages, lost profits must be capable of reasonable calculation.  *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).  But the best estimate for the number of piano tuners in Chicago is not zero.  Harrison and Tri-Capital entered into an agreement in the expectation that they would at least break even.  And, on average, a successful business owner recoups her expenses; Harrison has demonstrated that he was previously successful in the oil-and-gas industry.  Dkt. No. 91 at 6.  The best proxy for the expectation damages a new venture's backers suffer when it fails to come into existence is therefore not $0.  And Harrison can establish "with a reasonable degree of certainty" that he did not suffer zero damages.

Here, Harrison has offered a qualified expert who has analyzed the potential value of the Tri-Capital deal to Harrison under four scenarios, modeling varying costs and levels of success.  Those scenarios are predicated largely on the parties to the Tri-Capital deal's best estimates of their success.  They—like all entrepreneurs—likely overestimate their prospects for success.  But a jury can properly counterbalance any such overestimation in light of cross-examination and adverse evidence.  To the extent that cases that presume $0 damages for a new venture might be recast as adopting an information-forcing rule—one that incentivizes the plaintiff to offer evidence and analysis in support of a damages request— Harrison offers plenty of information the jury could use to rebut the presumption of $0 damages.  At a minimum, if the jury concludes that the advertisements did lead to the

demise of the Tri-Capital deal, the letter of intent took time and effort to negotiate.  Separate and apart from any lost future profits, Harrison incurred expenses—call them marketing costs—to bring the letter into existence.  Those are undoubtedly losses.  What is more, the defendants offer no evidence that the Tri-Capital deal would have caused Harrison to *lose* money.  Had they done so, their assertion of zero damages might be well-taken.  As it stands, the evidence is that Harrison was entitled to $1 million in guaranteed payments, plus a salary, from the Tri-Capital deal, in addition to 10% equity in the new venture.  Dkt. No. 91 at 9–10.

Were the Court to agree that the best estimate of the Tri-Capital deal's value is $0, the Court would commit a more fundamental error: the damages recoverable in a tort action differ from those recoverable in a contract action.  Many of the authorities cited by the defendants in their argument as to the damages available where a new venture fails to materialize come from the world of contract law.  *See, e.g.*, *Tex. Instruments*, 877 S.W.2d at 277; *SW Battery Corp. v. Owen*, 115 S.W.2d 1097, 1097–98 (Tex. 1938).  But a contract is not a tort.  As every first-year law student learns, a tortfeasor takes his victims as he finds them—the so-called "eggshell plaintiff rule."  And while the presumption of zero damages might make sense for the victim of a breach in a Holmesian, contracts-as-option world, it is inapposite in the context of tort law, which recognizes rights beyond perform-or-pay.  *Cf.* Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897).

Further, it would be odd to presume, as defendants would have the Court do, that the innocent party in a tort suit will be unsuccessful in a foiled business venture.  Such a rule would underdeter tortfeasors.  The existence of tortious interference as a cause of action demonstrates as much:  even if the underlying contract would have yielded a loss, a

procuring party has an action to deprive an intermeddling party of unjust gains.  The motivating logic behind the rule that a party is entitled to expectation damages is that it forces the breaching party to internalize all of the counterparty's costs.  That is not the same logic that drives tort damages, which aim to restore the plaintiff to her pre-tort condition.  And although Harrison has not pleaded a claim for tortious interference, the Court takes guidance from Texas law on what a plaintiff must prove in order to recover lost profits in a tortious-interference claim.  That law is clear that a plaintiff seeking to recover lost profits must prove a reasonable probability of a contractual relationship that is more than mere negotiations.  *Milam v. Nat'l Ins. Crime Bureau*, 989 S.W.2d 126, 132 (Tex. App.—San Antonio 1999, no pet.).  Although the letter of intent may not be a true contract, it is much more than "mere negotiations" and is strong evidence of a reasonable probability of a contractual relationship.

Cases like *Grob* notionally support the defendants' argument that speculative profits cannot support a damages award.[7]  *See Burkhart Grob Luft und Raumfahrt GmbH & Co. v. E-Systems, Inc.,* 257 F.3d 461 (5th Cir. 2001).  But even a cursory reading reveals that there is more to the story.

Grob was a manufacturer of excellent high-altitude propeller-driven planes, but it had never made a jet plane before.  ARPA—the Advanced Research Projects Agency of the Department of Defense—was interested in procuring a jet-powered, high-altitude reconnaissance plane.  Grob had a longstanding relationship with E-Systems, a defense contractor that specialized in what we now call C3ISR—command and control,

---

[7] The defendants also cite *Knight v. Sharif*, but that is a diversity case applying Mississippi law. 875 F.2d 516, 523 (5th Cir. 1989).

communications, intelligence, surveillance, and reconnaissance.  After some initial

trepidation, E-Systems decided it would team up with Grob to bid for the ARPA contract.

The parties entered into an exclusivity agreement and set to work on designs.  But when

finalists were chosen, the pair's design was not among them.  To Grob's dismay, the

ultimate winner was a design submitted by another division of E-Systems—one unrelated to

the Grob partnership.  Grob sued for breach of contract, tortious interference, and fraud.

257 F.3d at 463–66.

Judge Reno refused to submit the issue of lost profits to the jury because they were

too speculative.  *Id.* at 466.  The Fifth Circuit, applying Texas law, affirmed: "Grob has

produced no evidence that would allow an award of lost profits in this case.  If E-Systems

had not committed fraud in the Tier II+ competition, then presumably Grob would have

been able to work with E-Systems exclusively, would have submitted a bid on its own, or

would have teamed with another contractor to submit a bid.  However, the fact remains that

ARPA wanted a jet aircraft for this project, which Grob had never built. . . . In sum, no

matter how badly E-Systems might have behaved, Grob produced no evidence that it was

likely to find success in the Tier II+ program."  *Id.* at 468.

Here, Harrison was not bidding for one contract; he and Tri-Capital had entered into

an agreement to work together in the open market.  *Contra Grob*, 257 F.3d at 468.  Harrison

had a history of profitability in the oil-and-gas industry.  And it is for the jury to decide

whether the two wells that were to serve as proof-of-concept for Tri-Capital failed because of

the defendants' actions.  Unlike in *Grob*, where the alleged misconduct was wholly

disconnected from Grob's lack of experience in jet-aircraft production, the failure of the two

wells in this case may have been caused by the defendants' alleged misconduct.  Restricting

Harrison's losses to $0 on the supposition that the Tri-Capital venture had not earned any money would ignore not only that Tri-Capital placed a dollar value on Harrison's time and efforts, but the basic aim of tort damages to put a plaintiff in his pre-tort condition.

The economic-loss doctrine further militates against the defendants' assertions that $0 is the best estimate of damages in this case.  That doctrine seeks to drive contracting parties to channel disputes arising from contracts into contract law by foreclosing tort remedies.  So, for example, claims of fraud where a contracting party misrepresents her intent to pay on a contract are not actionable in tort because the parties can adequately protect their interests through the contracting process.  *See, e.g.*, *Schreiber Foods, Inc. v. Lei Wang*, 651 F.3d. 678, 680–81 (7th Cir. 2011) (Posner, J.).  All of the cases cited by the defendants and the *Grob* court can be explained by the economic-loss doctrine:  The plaintiff and the defendant had some sort of contractual relationship and, although the plaintiff may have brought tort claims, they were interwoven with—they sprung from—the contractual relationship.[8]  Presuming zero damages for a new venture in such cases may make perfect

---

[8] *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 164 (5th Cir. 2010) ("In this diversity jurisdiction case, we review a jury verdict and judgment in favor of Plaintiff Meaux Surface Protection, Inc. ("Meaux") on a claim for breach of fiduciary duty."); *Lovelace v. Sabine Consol., Inc.*, 733 S.W.2d 648, 655 (Tex. App.—Houston [14th Dist.] 1987, writ denied) ("Sabine Consolidated, Inc., appellee, sued Jesse R. Lovelace, individually and d/b/a Jesse Lovelace Construction Company, appellant, seeking an accounting and money damages for breach of contract, breach of fiduciary duty, and fraud."); *Aboud v. Schlichtemeier*, 6 S.W.3d 742, 744 (Tex. App.—Corpus Christi 1999, no writ) (The case arose out of an attempt by the parties to form an association for the purpose of conducting a cancer treatment center in El Paso."); *Ishin Speed Sport, Inc. v. Rutherford*, 933 S.W.2d 343, 346 (Tex. App.—Fort Worth 1996, no writ) ("Johnny Rutherford individually and a corporation known as Johnny Rutherford, Inc. sued Ishin Speed Sport, Inc. for breach of contract and resulting loss of profits."); *Dyll v. Adams*, 167 F.3d 945, 946 (5th Cir. 1999) ("This appeal involves a complex business transaction in which the Appellants agreed to market medical technology owned by the Plaintiff, Dr. Louis M. Dyll."); *DSC Comms. Corp. v. Next Level Comms.*, 107 F.3d 322, 325 (5th Cir. 1997) ("After a three week trial, the jury found Eames, Keeler and Next Level liable for breach of contract, diversion of corporate opportunity, and misappropriation of trade secrets.").

sense given that the parties are able to adequately gauge their interest in the venture and contract accordingly to guard against tort-like contretemps. But here, nothing Tri-Capital and Harrison could negotiate would adequately protect either side's interests against an intermeddler like the defendants. The defendants' conduct is extraneous to, rather than interwoven with, the letter of intent between Tri-Capital and Harrison. Leaning on commercial law—the law of expectation damages—to provide an adequate remedy for such extraneous torts would fail to place the full costs of a tort on the tortfeasor.

All of this is to say that the defendants' assertion that Harrison lost nothing due to the demise of the Tri-Capital deal is shaky at best. To be sure, the jury might conclude that the defendants committed no tort, or the jury might conclude that the deal's demise was not caused by the defendants' actions. But based on the evidence before the Court, the best estimate of the value of the Tri-Capital deal to Harrison is not zero, contrary to the defendants' implications. *See* Dkt. No. 140 at 7.

### ii.      Whether Harrison incurred any liabilities to Aztec under GAAP

Adams offers an opinion as to the potential accounting consequences of Harrison's May 3, 2019 e-mail to Jason Sandel. Dkt. No. 91 at 14. He writes that, under the Generally Accepted Accounting Principles, "Harrison would not have been required to record any debt or liability related to the Aztec Well Family on his or HLAD's balance sheet." *Id.* at 14 n.31. Adams's testimony as to whether the e-mail from Harrison to Aztec would constitute a liability under GAAP is admissible because that testimony may be useful to the jury in evaluating either the falsity of the advertisements or the defendants' state of mind when the advertisements were placed. As explained below, however, Adams may not testify as to the contents of the advertisements themselves.

### B.      Impermissible Testimony:

#### i.      Causation

*"Twenty-seven lawyers in the room, anybody know 'Post Hoc, Ergo Propter Hoc?'*
                              . . .
*After it, therefore because of it.  It means one thing follows the other, therefore it was caused by the other, but it's not always true.  In fact, it's hardly ever true."* [9]

Adams's report states that Harrison and Burkett "understand from the Tri-Capital investors that the deal ultimately dissolved after the Wanted Ads were published.  It is reasonable to conclude that *but-for* the Defendants' actions, the Tri-Capital Deal would not have dissolved."  Dkt. No. 91 at 19 (emphasis added).  As previously explained, that conclusion requires a chain of inferences:  that the defendants' publication of the advertisements caused other businesses to refuse to work with Harrison, which in turn caused the failure of two well projects, which in turn caused Tri-Capital to doubt the viability of its proposed deal with Harrison.

The defendants object to Adams's conclusion that the advertisements caused the deal's demise, arguing that this is little more than *ipse dixit*.  The Court agrees.  Adams offers no support for his conclusion that the advertisements caused the deal to fall through, nor is he qualified as an expert in what led Tri-Capital and its investors to get cold feet—he is an accountant, not a psychologist.  To be sure, Adams offers testimony as to general market conditions in the oil-and-gas industry at the time of the deal's demise.  While that might show that something other than macroeconomic forces were responsible for Tri-Capital pulling out, it does not prove that the advertisements—rather than the failure of the two trial wells—were the proximate cause.  Similarly, Adams has no expertise—or evidence—to

---

[9] *The West Wing: Post Hoc, Ergo Propter Hoc* (NBC television broadcast Sept. 29, 1999).

support his contentions that others ceased doing business with Harrison, thus leading to the trial wells' failure, as a result of the advertisements.  To the contrary, testimony from those other individuals indicates that the advertisements played no role in their decisions to cease working with Harrison.  "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citations omitted).  Accordingly, the Court must ensure that a particular expert possesses "'sufficient specialized knowledge to assist the jurors in deciding the particular issues.'"  *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)).  As to causation, Adams does not.  Adams's conclusions as to the cause of Harrison's troubles therefore amount to little more than *post hoc, ergo propter hoc*.  As such, they are unreliable and, thus, inadmissible.  *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

Even if Adams's report were well supported, the Court would exclude such testimony under Rule 403.  While an expert's report may encompass an ultimate issue, *see* Rule 704(a), the Court would conclude that Adams's testimony as to causation is likely to confuse the issues and mislead the jury.  The jury's first task in this case is to determine whether the advertisements were defamatory.  Allowing Adams to testify—under the label "expert"—as to the advertisements' effects would muddle the jury's separate inquiries into fault and damages.

>    ii.        Falsity

Adams's report states that the advertisements contained "information about the Plaintiff that was incorrect from an accounting perspective."  Dkt. No. 91 at 10; *see id.* at 10–16.  The defendants argue that this testimony should be excluded because it amounts to a legal conclusion.  Dkt. Nos. 140 at 6; 177 at 2–3.

The advertisements' truth or falsity is a core question for the jury; Adams's conclusory testimony that the advertisements are false from an accounting perspective would muddy the jury's understanding of its task.  Moreover, the conclusions Adams draws beg the question.  That is, Adams assumes that the advertisements claim that Harrison owes the defendants millions of dollars, and Adams then proceeds to explain why that is not true.  But the question the jury will answer is whether the advertisements claim that Harrison owes the defendants millions.  No one disputes that Harrison did not owe the defendants anything, as evidenced by the deposition excerpts Adams reproduces in his report.  *See* Dkt. No. 91 at 11–12 (citing defendants' multiple admissions that neither Harrison nor HLA&D owe the defendants any money).  Allowing Adams to testify as to the truth or falsity of the advertisements would thus not only confuse the jury, but would be needlessly duplicative of the admissions the defendants have already made.  *Cf.* Fed. R. Evid. 403.  The assistance of an expert is not necessary for a jury to accept the defendants' statements that Harrison owed Aztec nothing, either personally or from HLA&D.  And to the extent that the defendants argue otherwise—that Harrison somehow assumed liability for Copper Ridge's debts—Adams may, as explained above, testify as to the GAAP effects of Harrison's e-mail to AWS.  Because they are wholly irrelevant to the subjects on which Adams can qualify as an

expert and because they are rooted in nothing more than Adams's unsupported conclusions, Adams's opinions on the accuracy of the advertisements are inadmissible.[10]

### iii.    Hearsay regarding phone calls and text messages

The defendants object to the portions of Adams's report in which he offers opinions predicated on the defendants' alleged phone calls to others in the oil and gas industry.  Dkt. No. 140 at 4 (citing Dkt. No. 91 at 16).

The hearsay objection to Adams's report reveals that not all hearsay is created equal. Rule 703 does allow an expert to consider hearsay.  But that exception is not intended to sweep so broadly as to allow an expert to shoehorn inadmissible facts into court under the guise of his expert opinion.  Instead, the exception is designed to permit an expert to rely on sources normally considered by experts in her field when reaching an expert opinion.  *See* Fed. R. Evid. 703 advisory committee's note.  What a vendor said to Harrison, however, is not an accounting source.  The effects of what a vendor said may be an input into an accounting analysis, but Adams may not present conclusions as an "expert" on the text messages, for example, that Harrison allegedly received—his skills as an expert are limited to the financial impacts of what happened.  And Adams does not purport to apply any expertise to the hearsay evidence; he merely takes it as given.  Nor does he explain why causation is relevant to his DCF valuation.  The value of the Tri-Capital deal—the area where Adams applies his skills and training to data—is unaffected by any communications to Harrison purportedly induced by Aztec.

---

[10] As previously explained, Paragraphs 32–34 of the report, relating to Harrison's e-mails with Aztec over the repayment schedule, may be admitted to show that, under GAAP, that e-mail did not give rise to a "debt" owed by Harrison.  The remainder of Section VI.A of Adams's report is, however, inadmissible.

District courts "must serve a gate-keeping function with respect to Rule 703 opinions to ensure 'the expert isn't being used as a vehicle for circumventing the rules of evidence.'" *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) (Posner, J.)).  Indeed, "Rule 703 'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'"  *Id.* (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).  That is what Adams's testimony as to the phone calls and text messages amounts to.  The Court will not allow Harrison to use Rule 703 to launder inadmissible hearsay.

### iv.        "Additional Observations"

Adams notes "additional key takeaways regarding the Wanted Ads."  Dkt. No. 91 at 17.  First, Adams notes—as the Court has, *see, e.g.*, Dkt. No. 235 at 36, 38—that the ads were placed after the lien was filed.  *Id.*  Second, Adams notes the ads' omission of a named defendant in the Gaines County action that precipitated the ads' placement.  *Id.*  Finally, Adams notes that the cost of placing the advertisements far exceeds the cost of a process server.  *Id.*

None of these additional observations is admissible.  Adams offers no scientific basis for his conclusions; they are not testable.  They are conclusory and unsupported.  Nor are they the within the province of an accountant.  Allowing Adams to testify to these observations under the mantle of an "expert" witness would render the term meaningless.  Accordingly, they are inadmissible.

4.    **Defendant's Expert**

The defendants retained Dr. Bradley Ewing, an economist, to testify "regarding Plaintiffs' claimed damages and financial losses resulting from the alleged defamation of Plaintiff and in response to the expert opinions of Plaintiff's retained economist, Jacob Adams, CPA." Dkt. No. 97 at 1.[11] Ewing's report and addendum offer many critiques of Adams's methodology but offers little in the way of conclusions about Harrison's damages. What conclusion is offered comes in the form of contradictions: "any economic loss associated with the events/activities in question that is attributable to Aztec is nonexistent or negligible to no more than possible delay and transactions costs up to but not beyond the present day, including any relevant and pertinent 'breakup fee', for the relevant past period." Dkt. No. 98 at 7. In his addendum, Ewing provides actual numbers: the "delay time and associated transaction costs" range from $75,704 to $219,038 depending on the time period a jury deems relevant. Dkt. No. 139 at 6.

Harrison does not challenge Ewing's qualifications. Instead, he argues that Ewing's opinions are neither relevant nor reliable. Dkt. No. 138 at 5.

Unfortunately for the defendants, while Ewing's report and addendum spend many words assailing the methodology of the Adams Report, it offers little in the way of support for his own conclusions regarding damages. So little, in fact, that the conclusions can only be described as *ipse dixit*. Unsupported by any evidence and with an undisclosed methodology—if any at all—Ewing's conclusion that Harrison suffered "no to negligible

---

[11] Harrison never identified Adams as an "economist," and Adams never claims to be one, so the defendants and their expert tilt at windmills when they critique Adams's work as not that of "upstanding, respectable economist" (Dkt. No. 207 at 52)—as "unethical," even (*id.* at 50). *See, e.g.*, Dkt. No. 140 at 1, 4.

damages" bears the all the hallmarks of the "sketchy and vague" opinions the Rules Committee sought to eliminate. *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 571 (5th Cir. 1996) (citing Rule 26 advisory committee's note to 1993 Amendments).[12] Since it "is fundamentally unsupported . . . it offers no expert assistance to the jury," and must be excluded accordingly. *Viterbo*, 826 F.2d at 422.

### A.    Critiques of Adams's Report

The defendants designated Ewing as a responsive expert to rebut Adams's calculations. Ewing admits that he has "not gone through and come up with an analysis of all of these different risks," referring to the risks he faults Adams for not accounting for. Dkt. No. 207 at 48. Nor has he calculated the correct factors that one should use in valuing the Tri-Capital deal. *Id.* at 49. He criticizes Adams's use of a ten-percent discount rate for the Tri-Capital deal while admitting that he has not analyzed what an appropriate rate would be. *Id.* at 50.

Harrison does not challenge Ewing's qualifications as an economist. Nor does he mount a serious assault on Ewing's ability to critique Adams's methodology or conclusions. Excluding expert testimony is the exception, not the rule, and it will be for counsel and the jury to decide how much weight to assign Adams's DCF analysis. Ewing's criticisms of Adams's report are admissible.

---

[12] "The purpose of a 'detailed and complete' expert report as contemplated by Rule 26(a) . . . [is to] prevent an ambush at trial." *In re Enron Corp. Secs., Derivative & ERISA Litig.*, MDL No. 1446, 2007 WL 5023541, at *1 (S.D. Tex. Feb. 1, 2007) (quoting *Ortiz-Lopez v. Sociedad Española de Auxilio Mutuo y Beneficiena de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001)) (cleaned up). Because the Court concludes that Ewing's conclusions are unreliable, it need not address whether they satisfy the requirements of Rule 26—there will be no ambush.

### B.      Ewing's Conclusions

Ewing may not, however, offer his own testimony on damages.  Two fundamental flaws characterize Ewing's opinion and render it inadmissible.

### i.        Ewing's opinion is unreliable.

Rule 702 allows an expert to offer his opinions if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue.  Nothing about Ewing's opinion that Harrison suffered zero damages is rooted in his expertise as an economist.  Likewise, it is not the product of reliable methods.  Ewing's "methodology" cannot be tested because it is unexplained.  For similar reasons and to similar effect, his conclusions cannot be attacked for failing to incorporate one factor or another—the potential error rate of Ewing's methods or his adherence to standards and controls are unknowable.  Ewing's conclusion is entirely rooted on the supposition that Harrison could go out and deploy his skills in partnership with another investor—that the marketability of Harrison's knowledge was unaffected.  Putting aside that such a supposition is both unsupported and irrational, Ewing iterates time and again in his deposition that the economic analysis he performed was simple.  *E.g.*, Dkt. No. 207 at 18, 24, 26, 48, 50.  Providing authorities and exhibits in support of that analysis should have been an easy task, then.  And yet no evidence or exhibits are offered to support his conclusions.  Because Ewing's opinion is fundamentally unsupported, it is unreliable and inadmissible.

Ewing's opinion is also contradictory.  Ewing writes that the maximum loss Harrison could have suffered as a result of the defendants' actions is from "delay time." Delay time is essentially opportunity cost.  Ewing takes Harrison's average salary over the

past five years and multiplies it by the amount of time that passed between the Tri-Capital deal being inked and its demise to arrive at a figure of roughly seventy-five thousand dollars in losses.  Dkt. No. 139 at 6.  Or, if the jury wants, more than $200,000, depending on what time period the jury deems relevant.  *Id.*  But Ewing previously concluded that nothing was recoverable because Harrison's knowledge of horizontal drilling suffered no "economic loss" due to the deal's demise.  Dkt. No. 98-1 at 7.  Offering alternative scenarios is perfectly acceptable; that is what Adams did.  But Ewing does not explain what changes he makes to reach his conflicting figures; to explain different outputs, an expert must explain which variables have been changed.  The only explanation that is offered is that a jury might conclude that Harrison suffered delay-time costs as a result of the defendants' actions, and that the jury might vary the amount of time for which Harrison is entitled to such costs.  The implication of that statement is that, in the scenarios Ewing posits where Harrison has no or negligible "economic losses," he assumes that the jury holds the defendants harmless.  That is not a permissible basis on which to rest his opinion on damages:  Ewing cannot offer a calculation of damages that is entirely dependent upon a finding of either nonliability or noncausation.  Given that Ewing arrives at two—or four—different figures as to what Harrison's damages are, all of which equally unsupported and untestable, the Court concludes that all of his damages opinions are unreliable.

More fundamentally, Ewing's conclusion that Harrison suffered no losses (again, "economic losses," "damages," choose your preferred noun) because he could simply find another investor to team up with is, to use Ewing's favorite language, nonsensical.[13]  A bird in the hand is worth two in the bush.  Of course Harrison could have gone out and found

---

[13] Dkt. No. 207 at 21, 24, 31, 32, 34, 36, 45, 46.

another partner.  That is not the question, though.  The question is what losses Harrison

suffered because the Tri-Capital deal fell apart.  Ewing's opinion sounds in the same register

as a contracting party's "duty" to mitigate damages.  But, as explained above, this is not a

contract case.  The defendants, if found liable, are liable for all of the damages proximately

caused by their tortious conduct.  And Ewing admits that he took no account of any

reputational damage Harrison suffered, nor did he undertake a valuation of the Tri-Capital

deal.  Dkt. No. 207 at 27, 48.

###### ii.        Ewing's opinion offers the jury no help.

Rather than opine as to the damages Harrison allegedly suffered as a result of the

defendants' actions—the very thing he was designated as an expert on, *see* Dkt. Nos. 97 and

98 at 1—Ewing offers an opinion on the economic loss Harrison's "knowledge resource"

suffered as a result of the defendants' actions.  *See* Dkt. No. 207 at 33 ("Damages have to

damage the actual asset in this particular case or the knowledge resource that Mr. Harrison

claims to have.  To my knowledge, he still has that resource available to him.").

Throughout his deposition, Ewing waffles and evades the question of whether he actually

offered an opinion on damages—as the law understands the term—by throwing around

words like "economic loss" and by using inapposite classroom examples.  *Id.* at 20, 26, 27,

31, 49.  But this is not a classroom exercise; this is federal court, and an expert who has been

designated to testify on "damages" may not hide behind protestations to the effect of "I am

not a lawyer, so I don't know what you mean by 'damages.'"

In any event, Ewing's own classroom example demonstrates why his opinion is

untethered to the issue of damages in this case.  He uses an example of a project with a true

value of $1,000 that has been inaccurately valued at $10,000, then concludes that

"[w]hatever the correct value was, if you still have it under your possession, then it's still that.  There's no loss."  *Id.* at 49.  Applying this to Harrison's situation, Ewing says Harrison suffered no loss due to the Tri-Capital deal's demise because he still possessed the "knowledge resource" of how to manage horizontal-drilling projects.  Dkt. No. 98-1 at 6–7.

As counsel for Harrison alluded to when deposing Ewing, there is value in having an agreement with a partner.  Dkt. No. 207 at 37.  Ewing evaded that point by saying that the Tri-Capital deal, like all deals, was not guaranteed to succeed.  *Id.*  True, but so what?  Simply because Harrison could *theoretically* find another partner does not mean his preexisting partnership with Tri-Capital was worthless.  The uncontroverted evidence in this case is that Harrison would have received definite payments and a salary from Tri-Capital had the deal proceeded.  Dkt. No. 91 at 18–19.  Those future income streams have an option value.  Yet Ewing's analysis ignores them entirely.  Ewing claims that whatever benefits the Tri-Capital deal offered, "whether it came in the form of salary, ownership, debt obligations, however it would be structured, those benefits are still available to Mr. Harrison."  Dkt. No. 207 at 39.  The disconnect between the evidence in this case and Ewing's conclusions cannot be chalked up to disagreements about sources or methods.

The gulf between Ewing's version of damages—"economic loss" to a "knowledge resource"—and what the jury is asked to evaluate in a defamation case is simply too great for the Court to admit Ewing's conclusions.  While an expert need not offer an opinion that is all-encompassing, an expert must offer an opinion that helps the jury.  A jury gets no value from Ewing's expert opinion that Harrison still has the knowledge that he had before the Tri-Capital deal fell through.  A layperson could testify to the same effect as Ewing because his opinion "results from a process of reasoning familiar in everyday life" rather

than from "a process of reasoning which can be mastered only by specialists in the field." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008) (cleaned up). It does not take a doctorate in economics to reach Ewing's conclusions—just common sense and arithmetic. Accordingly, Ewing's opinion as an "expert" offers the jury no help and is inadmissible as a result.

*       *       *

The Court notes that Harrison erroneously quoted from a motion to exclude Ewing's testimony in a 2014 Western District of Oklahoma case. Dkt. No. 138 at 7–8 (quoting Defendant's Motion to Exclude the Testimony of Plaintiff's Experts Lacy, Wintroath, and Ewing and Brief in Support at 12, *Bernal v. TK Stanley, Inc.*, No. 5:12-CV-392-R (W.D. Okla. May 27, 2014) (ECF 92)). Harrison represented that the quoted language was from an order, not a motion. *Id.* The defendants correctly point out the error. Dkt. No. 172 at 7. Judge Russell never said what Harrison says he said. Ewing's testimony was stricken anyway: the party who offered Ewing's testimony failed to respond to the motion to strike, so Judge Russell granted the motion by default. *See Bernal v. TK Stanley, Inc.*, No. 5:12-CV-392-R (W.D. Okla. July 1, 2014) (ECF 102). Still, the Court recognizes that no court has ever said that, because "Dr. Ewing did not show his work, his report is unreliable and thus inadmissible." Dkt. No. 138 at 8.

At least, until now: Because Ewing did not show his work, his conclusions are unreliable and therefore inadmissible. The Court's task in evaluating the admissibility of Ewing's testimony would have been easier had Ewing responded to questions from Harrison's counsel. Perhaps that was the point—much heat, little light. Regardless, the Court has no trouble concluding that Ewing's conclusions as to the economic loss to

– 28 –

Harrison's "knowledge resource" are unsupported, irrelevant, and, to the extent they are relevant, are likely to confuse the issues and mislead the jury. Harrison's knowledge of horizontal drilling techniques and his reputation are two different things. The jury's task is to determine the harm to the latter, not the former alone. Because Ewing's testimony only addresses the former, it is inadmissible.

## 5.    Conclusion

To sum up:  Adams's testimony is admissible for the issues on which he is an expert—the valuation of the Tri-Capital deal and whether the e-mail from Harrison to Sandel could give rise to a GAAP-reportable liability. Adams may not testify, however, as to the cause of the Tri-Capital deal's demise, whether the advertisements are true or false, on any of the "additional observations," or on the defendants' alleged republication of the advertisements or their content.

Meanwhile, Ewing's opinion and testimony as to the alleged flaws in Adams's methodology and conclusions are admissible. But his conclusions as to the "economic loss" to Harrison's "knowledge resource" are inadmissible because they are wholly unsupported and of no value to the jury.[14]

So ordered on January 13, 2022.

_Jaus W. Hendrix_

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

---

[14] Ewing testified that he is unaware whether his testimony has ever been stricken or excluded. Dkt. No. 207 at 14. His testimony has been stricken by a judge of this Court on at least one prior occasion. *PJ Day, LLC v. State Auto. Mutual*, No. 5:17-CV-233-C, 2019 WL 10784420 (N.D. Tex. Feb. 26, 2019) (Cummings, J.). To avoid future confusion as to the Court's evaluation of their reports and testimony in this case, counsel for each side is directed to transmit a copy of this order to their respective expert.